(Nos. 55679, 55680 cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant and Appellee, v. PHILIP KLINE, Appellee and Appellant.

*Opinion filed September 30, 1982.—Rehearing denied November 24, 1982.*

SIMON, J., took no part.

Tyrone C. Fahner, Attorney General, of Springfield, and Edward F. Petka, State's Attorney, of Joliet (Michael B. Weinstein and Jack Donatelli, Assistant Attorneys General, of Chicago, and John X. Breslin and Rita Kennedy Mertel, of the State's Attorneys Appellate Service Commission, of Ottawa, of counsel), for the People.

Shelvin Singer, of Chicago, for appellee.

JUSTICE MORAN delivered the opinion of the court:

Philip Kline, Arthur Garza and Glenn Schultz, Jr., were joined in an indictment for the offense of murder in violation of section 9—1(a)(1) of the Criminal Code of 1961 (Ill. Rev. Stat. 1971, ch. 38, par. 9—1(a)(1)). Each was tried separately. This appeal involves Philip Kline (defendant), who, following a bench trial in the circuit court of Will County, was found guilty as charged. He was sentenced to a term of 50 to 100 years' imprisonment. (Garza and Schultz, who were tried and convicted after defendant, were sentenced to prison terms of 15 to 25 years and 20 to 25 years, respectively.) A majority of the appellate court affirmed defendant's conviction, but remanded the cause to the trial court for resentencing. (99 Ill. App. 3d 540.) We granted both the State and defendant leave to appeal, and consolidated the causes for purposes of review.

The following issues are raised by defendant: (1) Do the statutory provisions which authorize prosecution of a felony by either indictment or a preliminary hearing violate defendant's rights to equal protection and due process? (2) Did the State knowingly conceal exculpatory information in violation of defendant's right to due process? (3) Did the trial court abuse its discretion in restricting defendant's cross-examination of the State's principal witness? (4) Was defendant proved guilty beyond a reasonable doubt? The State, in its appeal, raises the additional question of whether the appellate court's

order remanding the cause for resentencing was proper.

The record discloses that Bridgette Regli, a student at Crete-Monee High School, was bludgeoned to death on December 6, 1973. Her body was discovered two days later in a field in Will County. A pathologist testified that death resulted from a blow to the left rear of the victim's head, which could have been administered by a tree limb. Although not fatal, there was also a penetrating wound on the forehead which was caused by a rounded or ovoid object. The witness indicated that the wound could have been inflicted with the shaft of a golf club. On re-cross-examination, he stated that other items with a similar circumference may have administered the blow. There were also a number of superficial cuts, scrapes and abrasions on the victim's body and certain marks on her neck. According to the pathologist, the marks indicated an attempted strangulation, although death was not caused by choking. The witness further stated that the death occurred between four and six hours after the decedent's last meal, which was at approximately 6:45 a.m.

Germaine Einhorn, another witness for the State, testified that she attended band class with the victim from 12 p.m. until 1 p.m. on the date in question. It was their last class, after which they generally went home for lunch. The witness also stated that the decedent was a photographer for the school yearbook and carried a camera nearly every day.

Valinda Avey, who was acquainted with Bridgette, attended a junior high school located near Crete-Monee High School. She testified that, on the day of the murder, she was working at school as an office aide. At approximately 1 p.m. she happened to gaze out the window and observed the victim walking down the street. She was carrying books and a "bulky" object which the witness could not identify. Avey further testified that she

saw a car stop just ahead of the victim. The witness described the car as being a cream or other light color with a dark interior. She could not recall if it was two-toned, but noted that it was a two-door vehicle and resembled a Mustang.

She further indicated that a man got out on the passenger side of the car. She stated that he was a Mexican or "other nationality" of about high school age. He was not obese and had dark, shoulder length hair. According to other testimony, this description matches that of Arthur Garza. The victim entered the car, apparently voluntarily, and it was driven away in a southerly direction.

The State's principal witness was Anna Kline, the estranged wife of the defendant. She testified that she became acquainted with the defendant in September of 1973. They lived together sporadically from 1974 through February 1976, at which time they were married. She stated that defendant was a narcotics user and that he occasionally sold drugs in the high school parking lot.

The crux of Anna's testimony concerned certain conversations which she had with defendant prior to their marriage. She testified that in November of 1975, defendant discussed with her the murder. He stated that Garza murdered the victim by striking her with a golf club. He admitted that he was present during the killing, but said that he never touched her. He indicated that Garza killed her because she had taken a picture of a drug transaction. Defendant also said that, after attempting to destroy the film, he put the camera in his car trunk. During a subsequent conversation, defendant stated that when he took the camera he felt like choking the victim, but he did not.

Anna further testified that she saw the defendant and Garza during the early evening of December 6, 1973. They were selling albums in order to raise money

for a Florida trip. At the conclusion of her testimony, she indicated that she still loved the defendant. She also stated that the police initially contacted her concerning the murder.

The focus of cross-examination was to discredit Anna's testimony. The defense established that she used narcotics and occasionally sold them. She admitted that in December of 1978, when she first informed the police of defendant's incriminating statements, she was taking 30 milligrams of valium each day. She further stated that, although she heard rumors in 1973 of defendant's involvement in the offense, she never questioned him about it until 1975. Also established was that, subsequent to her marriage, defendant went to California with another woman. Later, the witness wrote to defendant, while he was in custody, and informed him that she planned to divorce him and marry someone else.

The defense mainly consisted of attacks on Anna's credibility. Her sister testified that Anna said she no longer wanted to testify against defendant, and that she initially planned to do so out of revenge. Two other witnesses stated that they heard Anna tell defendant's sister that she would get revenge on defendant for going to California with another woman.

In 1978, while separated from defendant, Anna resided with Mark Pascarella. Pascarella testified that he moved out of her apartment following an argument. Sometime thereafter, Anna called him requesting rent money. He refused, and Anna later informed the police that he had sexually molested her daughter. He denied the accusation, and no charges were filed. Anna's sister-in-law testified that Anna said she accused Pascarella of attacking her daughter because he would not pay any rent money.

In a further effort to establish Anna's lack of credibility, defendant's mother related a conversation which she

had with her in January of 1979. At that time, Anna telephoned Mrs. Kline at the family-owned corporation requesting defendant's alleged share of the company. Mrs. Kline refused to give Anna any money, at which point Anna threatened that she would see defendant "rot in jail." An employee of the Klines, who was listening to the discussion on an extension phone, confirmed that this conversation took place.

Jeff Beasley, an investigator for the public defender's office, testified that he interviewed Anna in May of 1979. At that time, she said that defendant initially denied any involvement in the killing; that he only admitted complicity when he was under the influence of narcotics; and that she informed the police about defendant's alleged involvement in the crime because she was "high on valium." Anna further informed Beasley that an officer told her she would lose her children and be charged with withholding information if she refused to cooperate. On the witness stand, Anna denied some of these statements and attempted to explain others.

Defendant also called two witnesses to the stand in an effort to establish an alibi for his whereabouts at the time of the offense. Bernice Clark and James Roberts, who were defendant's classmates in high school, testified that they were with him on December 6, 1973. Clark stated that she was with defendant until 1:30 p.m. that afternoon. Roberts testified that he was at defendant's home until about 3 p.m. He admitted to having taken LSD (lysergic acid diethylamide), that day. Both Clark and Roberts occasionally purchased drugs from defendant.

Defendant took the stand in his own behalf and initially stated that he had four prior felony convictions. He denied any knowledge of or involvement in the murder. Defendant testified that he was with friends nearly all day on December 6, and that night he and Garza left for

a trip to Florida. He stated that he had been planning the trip because of problems with his parents. He left that particular night because he was going to be confined to his home for a month starting that weekend. Defendant said he brought his golf clubs with him in the trunk of his car because he planned to earn money golfing in Florida. He also brought a camera which he claimed was his, and which he allegedly sold to an elderly couple on a beach in Miami.

Defendant further testified that he first learned of the murder on December 14, 1973, when he called his parents from Florida. He said that he and Garza immediately hitchhiked home to clear themselves of suspicion.

During cross-examination, defendant admitted that, on the morning of the murder, he smoked a marijuana cigarette in the high school parking lot. He stated that he may have passed it to a friend. Further, his testimony concerning the events which transpired on December 6 was impeached by a number of prior inconsistent statements he had given to the police. For instance, defendant testified that, on December 6, he left school after attending two classes. He then drove a friend to Dolton, Illinois, arriving there between 10:30 and 11 a.m. From there, defendant and some friends went to his house, at approximately 12 p.m. In a statement which defendant made to a police officer on December 16, 1973, he initially stated that he attended classes on the day of the murder from 7:30 a.m. until noon. From there he and some friends went to a McDonald's restaurant in Steger, Illinois. When the officer told defendant that the school records indicated he left school at 9:15 a.m., defendant then stated he left school at 9:30 a.m.

Further, defendant testified that he was at his or a friend's home almost all afternoon. In his statement, he told the officer that he went to a railroad salvage yard to sell copper. Defendant also testified that he brought

his friend to Dolton to see his mother. However, in the statement he indicated that they went there to purchase marijuana. Also contrary to his testimony, defendant said that, on December 6, he purchased LSD from a friend.

A police officer, John Watters, testified for the State in rebuttal. He said that he interviewed Bernice Clark and James Roberts prior to trial. At that time, they gave statements regarding their activities on December 6 which are inconsistent with their testimony at trial. For example, Clark had stated that she was with the defendant and Garza from 11 a.m. until approximately 12:30 p.m., at which time defendant brought her home. In the interim, she said that they went to Dolton, Illinois, to purchase marijuana, which they smoked on the ride back home. (We note also that, in a statement which Clark made to another police officer, she stated that she was with the defendant from 7 a.m. until 3 p.m. on the day in question.) In Robert's prior statement to Watters, he initially said that he met with defendant around 1:30 p.m. on December 6. Later, however, he indicated to the officer that he was in defendant's company from 9 a.m. until 9 p.m.

We first consider whether the statutory provisions which authorize prosecution of a felony by either indictment or a preliminary hearing (Ill. Rev. Stat. 1971, ch. 38, pars. 111—1, 111—2) violate defendant's rights to equal protection and due process. Defendant suggests that those individuals who receive a preliminary hearing have an unfair advantage over those who are indicted. He points out that defendants afforded a preliminary hearing are entitled to have counsel present, to cross-examine witnesses, and to have access to evidence enabling them to prepare a better defense. In support of his position, defendant cites cases from two other jurisdictions which hold that a probable-cause hearing is required

even where an accused has been indicted. *Hawkins v. Superior Court* (1978), 22 Cal. 3d 584, 586 P.2d 916, 150 Cal. Rptr. 435; *People v. Duncan* (1972), 388 Mich. 489, 201 N.W.2d 629.

We note initially that the purpose of both the indictment and the preliminary hearing is to determine probable cause. Section 7 of article I of the 1970 Illinois Constitution provides, in part:

"No person shall be held to answer for a crime punishable by death or by imprisonment in the penitentiary unless *either* the initial charge has been brought by indictment of a grand jury *or* the person has been given a prompt preliminary hearing to establish probable cause." (Emphasis added.) (Ill. Const. 1970, art. I, sec. 7.)

This provision, worded in the disjunctive, clearly establishes that a defendant is not entitled to a preliminary hearing when he is charged by indictment. (See also 7 Record of Proceedings, Sixth Illinois Constitutional Convention 2600.) All that is required is that an accused "be afforded a prompt probable-cause determination of the validity of the charge either at a preliminary hearing or by an indictment by a grand jury." (*People v. Howell* (1975), 60 Ill. 2d 117, 119, citing *People v. Kent* (1972), 54 Ill. 2d 161; *People v. Hendrix* (1973), 54 Ill. 2d 165; see also *People v. Redmond* (1977), 67 Ill. 2d 242; *People v. Adams* (1970), 46 Ill. 2d 200, *aff'd on other grounds* (1972), 405 U.S. 278, 31 L. Ed. 2d 202, 92 S. Ct. 916; *People v. Franklin* (1979), 80 Ill. App. 3d 128; *People v. Arbogast* (1976), 41 Ill. App. 3d 187.) We see no reason to depart from this well-established rule.

Further, our constitution specifically empowers the General Assembly to "abolish the grand jury or further limit its use." (Ill. Const. 1970, art. I, sec. 7.) Section 111—2 still authorizes the prosecution of felonies by indictment. (Ill. Rev. Stat. 1973, ch. 38, par. 111—2.) For all of these reasons, we decline to impose a requirement that every defendant be afforded, in addition to the grand jury indict-

ment, a preliminary hearing for purposes of again determining probable cause.

Defendant next contends that the State knowingly concealed exculpatory information in violation of his right to due process. He argues that the evidence presented in his trial improperly differed from the evidence at Garza's trial. We have no record to verify what evidence was introduced at Garza's later trial. However, since the State does not dispute that the evidence differed in the following respects, we will answer defendant's contentions. Defendant first points out that, at his trial, the State argued that the decedent was struck with the shaft of a golf club. During Garza's trial, it was claimed that she was struck with a tire iron.

The nature of the wound located on decedent's forehead supported both theories. The pathologist testified that the blow could have been administered by the shaft of a golf club, or other object with a similar circumference. Neither weapon was introduced into evidence at the trials, and defendant has failed to produce any evidence which established the instrument used or that the State had knowledge or possession of the weapon involved. As noted by the appellate court, if the State, in this case, had the tire iron in its possession, and failed to disclose this evidence, defendant's charge of misconduct might well be supported. On the facts before us, however, we cannot say that the State knowingly concealed evidence of the weapon involved in the offense.

Defendant also contends that the State improperly concealed the fact that no camera was missing from decedent's home. This fact was apparently established at Garza's trial. At defendant's trial, the State argued that a camera was taken from the victim on the day of the murder. In support of his concealment charge, defendant points out that the police reports failed to reveal that a camera was not missing from the Regli home. However, there is

no proof that, at the time of the instant trial, the State was aware of this evidence. Therefore, the alleged omission in the police report does not establish improper concealment on the part of the State.

Defendant further points out that the State objected to a defense question regarding the victim's ownership of a camera. He implies that the objection was made in order to conceal the fact that no camera was missing. As defendant concedes, the question, asked during re-cross-examination, went beyond the scope of the redirect examination. Therefore, the objection was proper and does not imply an effort on the State's part to conceal information. For these reasons, *People v. Murdock* (1968), 39 Ill. 2d 553, cited by defendant, is inapposite.

In *Murdock*, the State argued a theory of the case without revealing a witness' statement which contradicted that theory. This court reversed defendant's conviction because it was clear that the State *intentionally* concealed the evidence. In the instant case, there is no proof that the State purposefully withheld relevant information concerning the camera. We find that defendant has failed to support either of his concealment charges.

It is next contended that the trial court abused its discretion in restricting defendant's cross-examination of the State's principal witness. Specifically, it is urged that defendant should have been permitted to inquire into conversations Anna Kline had with an attorney regarding a possible divorce. The trial court apparently determined that these conversations were protected by the attorney-client privilege. We need not decide whether, as defendant suggests, the evidentiary privilege must yield to the right of effective cross-examination. The reason for the attempted cross-examination was to establish that the witness was seeking a divorce, and thus did not love defendant, as she claimed.

Anna admitted that she wrote to the defendant, inform-

ing him that she was planning a divorce. In addition, defendant's father testified that he received a letter from her attorney regarding a divorce action and property settlement. This letter was introduced into evidence. On these facts, we cannot say that defendant was prejudiced by the court's ruling disallowing the testimony. Consequently, such ruling does not constitute reversible error. See *People v. Coles* (1979), 74 Ill. 2d 393, 396.

Defendant also asserts that the trial court erred in refusing to allow him to cross-examine Anna concerning her alleged nervous breakdown in 1978. It is argued that this evidence is relevant because that was the year in which Anna informed the police officers about defendant's admissions. Hence, as noted by the appellate court, the purpose in eliciting this testimony was to establish Anna's lack of stability.

> " 'As a general rule the latitude to be allowed in cross-examination of witnesses rests largely in the discretion of the trial court. *** [I]t is only in a case of clear abuse of such discretion, resulting in manifest prejudice to the defendant, that a reviewing court will interfere.' " *People v. Gallo* (1973), 54 Ill. 2d 343, 356; quoting *People v. Halteman* (1956), 10 Ill. 2d 74, 86; see also *People v. Coles* (1979), 74 Ill. 2d 393, 396; *People v. Nugara* (1968), 39 Ill. 2d 482, 487-88, *cert. denied* (1968), 393 U.S. 925, 21 L. Ed. 2d 261, 89 S. Ct. 257.

We note initially that this was a bench trial. The court had before it ample evidence from which to assess Anna's credibility. The evidence established that she both used and sold narcotics; that she engaged in adulterous relationships; that she made a number of prior inconsistent statements; and that she possibly harbored feelings of revenge against the defendant. It is clear that the defense was afforded considerable opportunity to establish Anna's lack of credibility. While it may have been error to disallow the evidence in question, still we find, under the facts related, that there was no prejudice to defendant sufficient to con-

stitute reversible error.

Finally, defendant contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt. We disagree. The trial court was faced with conflicting evidence. Under these circumstances, credibility assessments assume special significance. As this court stated in *People v. Manion* (1977), 67 Ill. 2d 564, 578:

> "Where 'the evidence is irreconcilably conflicting, it is the peculiar prerogative of the trier of fact *** to ascertain the truth.' (*People v. Hammond* (1970), 45 Ill. 2d 269, 278.) A reviewing court may not substitute its judgment for that of the trier of fact 'on questions involving the weight of the evidence or the credibility of the witnesses *** ' "

In the instant case, the trial judge chose to believe Anna Kline rather than the defendant. We cannot say this decision was erroneous. Although Anna was impeached with certain prior inconsistent statements, so too were the defendant and his alibi witnesses. Further, her testimony was corroborated in certain particulars.

The evidence indicated that defendant was in the company of Garza on the day of the murder. Anna testified that defendant had stated Garza was involved in the offense. He admitted to smoking a marijuana cigarette in the high school parking lot and said he possibly passed it to a friend. According to Anna, the motive for the offense was that the victim had taken a picture of a drug transaction. She also stated that the victim was struck with the shaft of a golf club. Defendant always carried his clubs with him, and a pathologist testified that one of the wounds could have been caused by the shaft of a golf club. Anna also stated that defendant said he felt like choking the victim, but did not. There were marks on her neck which the pathologist testified were consistent with an attempted strangulation.

Defendant left for Florida on the evening of the murder. He testified that he brought with him a camera which

he subsequently sold. Although he stated the camera was his, the court was not required to believe him. Further, the evidence established that defendant drove a 1970 two-door Mustang, with a tan-colored interior. The body of the car is white or light colored, and it has a dark top. Valinda Avey testified that the car which the victim entered was a two-door and it resembled a Mustang. Although she could not recall if it was two-toned, she said the car was light colored. She also testified that the interior was a dark color. Photographs of defendant's car, in the record, reveal that the interior does appear dark in comparison to the exterior. Contrary to defendant's assertion, we believe Avey's description substantially matched that of defendant's car. Further, the man whom the witness described as a passenger in the car fits the description of Garza.

We are not unmindful of the evidence indicating Anna's bias against defendant, and her possible desire for revenge. However, we agree with the appellate court "that while revenge may have been the motive behind her disclosure of [defendant's] admissions, such evidence of her bias does not establish that the substances of her disclosures were fabricated for the purposes of revenge." 99 Ill. App. 3d 540, 548.

It is well-established that a " '*** finding of guilty will be disturbed only where the evidence is so unreasonable, improbable or unsatisfactory as to leave a reasonable doubt as to the defendant's guilt. [Citation.]' " (*People v. Durley* (1972), 51 Ill. 2d 590, 593, quoting *People v. Adams* (1970), 46 Ill. 2d 200, 209; see also *People v. Ellis* (1978), 74 Ill. 2d 489, 496; *People v. Yarbrough* (1977), 67 Ill. 2d 222, 227; *People v. McDonald* (1975), 62 Ill. 2d 448, 456.) There was evidence presented to the court which, if believed, was sufficient to establish defendant's guilt beyond a reasonable doubt.

The State raises the additional issue of whether the appellate court erred in remanding the cause for resentenc-

ing. The instant offense was committed in 1973, and defendant was not brought to trial until 1979. The same judge who sentenced defendant Kline to a term of 50 to 100 years' imprisonment later sentenced defendant Schultz to a prison term of 20 to 25 years. Defendant Garza, sentenced by a different judge, received a prison term of 15 to 25 years.

The appellate court cited a number of cases which hold "that defendants similarly situated may not receive grossly disparate sentences." (*People v. Henne* (1973), 10 Ill. App. 3d 179, 180.) It nevertheless indicated a willingness to affirm defendant's sentence on the basis of his criminal record. Specifically, at the time defendant was sentenced, he had been convicted of two murders and one attempted murder arising out of the same incident. However, during the pendency of the instant appeal, defendant's convictions in the other case were reversed, and the cause was remanded for a new trial. (*People v. Kline* (1980), 90 Ill. App. 3d 1008.) The appellate court, determining that there was no longer a basis for defendant's disparate sentence, held that he was entitled to a new sentencing hearing.

This conclusion ignores the crucial fact that, in imposing sentence on the defendant, the trial court did not consider the murder and attempted-murder convictions. Indeed, the judge specifically stated:

"We have a situation [here] where an offense was committed a number of years ago with conviction coming approximately six years after the offense was committed.

In the intervening period, there have been convictions of the defendant. *The Court is going to consider this offense and what the Court would have felt would have been a proper sentence as if the conviction on this charge was the first and only conviction on the charge of murder of this defendant.*

The Court is aware that it can consider the other two offenses and the third offense of Attempt Murder, as well as the robbery.

However, this Court feels that in view of the testi-

mony that was elicited at trial, that the Court, if it had tried this offense prior to the convictions in Cook County for two Counts of Murder and one Count of Attempt Murder and the Robbery conviction out of California, this Court would have sentenced this defendant to serve a period of fifty to one hundred years in the Department of Corrections." (Emphasis added.)

Under these circumstances, the fact that defendant's convictions in Cook County were subsequently reversed is simply not relevant.

There is a further reason which counsels against remanding this cause for resentencing. Although an arbitrary and unreasonable disparity between the sentences of codefendants is impermissible (*People v. Godinez* (1982), 91 Ill. 2d 47, 55), the mere fact that one defendant receives a substantially longer sentence than another does not, by itself, establish a violation of fundamental fairness. For example, "[a] disparity between sentences will not be disturbed, *** where it is warranted by differences in the nature and extent of the concerned defendants' participation in the offense." (91 Ill. 2d 47, 55; citing *People v. Martin* (1980), 81 Ill. App. 3d 238; *People v. Olmos* (1979), 77 Ill. App. 3d 287; *People v. Johnson* (1978), 59 Ill. App. 3d 640.) Recognizing the need to compare defendant's circumstances with those of his codefendants', the appellate court correctly stated:

"The question of maintenance or modification of the sentence of defendant Kline is subject to the test as to the criminal record of defendant Kline as compared with the criminal records of the other participants in the crime. Also, in addition to a review of the criminal records of the parties, consideration should also be focused upon the relative participation of the respective parties in the crime for which they have been convicted." 99 Ill. App. 3d 540, 554.

Defendant apparently failed to provide the appellate court with any records relative to his codefendants. Nevertheless, the court reversed and remanded defendant's sen-

tence without any proof that it was unfairly disparate. This procedure, we believe, was improper.

It is the defendant's burden to produce a record from which a rational comparison of sentences can be made. (*People v. Gangestad* (1982), 105 Ill. App. 3d 774; *People v. Holman* (1976), 43 Ill. App. 3d 56; *People v. Hansen* (1971), 132 Ill. App. 2d 911; *People v. Haynes* (1971), 132 Ill. App. 2d 130.) Because he has failed to do this, we cannot determine, as we must, whether the trial court abused its discretion in imposing the sentence. (See *People v. Willingham* (1982),89 Ill. 2d 352, 364; *People v. Cox* (1980), 82 Ill. 2d 268, 280; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154; *People v. Allen* (1974), 56 Ill. 2d 536, 547.) We are unaware of the factors which the court relied on in sentencing Garza and Schultz. It therefore cannot be determined whether or not the disparity in sentences is justified. Since defendant did not provide the information necessary for a proper consideration of his contention, the appellate court erred in remanding the cause for resentencing.

Accordingly, the judgment of the appellate court is affirmed in part and reversed in part, and the judgment of the circuit court of Will County is affirmed.

> *Appellate court affirmed in*
> *part and reversed in part;*
> *circuit court affirmed.*

JUSTICE SIMON took no part in the consideration or decision of this case.