THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROCHELLE CRUM, Defendant-Appellant.

First District (3rd Division) No. 1—86—0418

Opinion filed April 19, 1989.—Rehearing denied June 14, 1989.

474

Sue Augustus, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Susan J. Crane, and Judy L. DeAngelis, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE FREEMAN delivered the opinion of the court:

Defendant, Rochelle Crum, was indicted for murder and armed violence arising out of the shooting death of her husband, Odie Crum. After a bench trial defendant was found guilty of both offenses and sentenced to concurrent sentences of 24 years for murder and six years for armed violence. Defendant appeals and raises the following contentions: (1) the murder conviction should be reversed, or alternatively, reduced to voluntary manslaughter based on self-defense or mutual combat; (2) the trial court erred in ruling that evidence of the victim's prior violent acts was admissible only if it was shown that defendant knew about them; (3) defendant was denied a fair trial by the State's questions and argument regarding insurance policies and property of the victim, where there was no evidence of a financial motive for the shooting; (4) defendant was denied a fair trial by the State's argument that accident and self-defense were mutually exclusive defenses; (5) defendant was denied the effective assistance of counsel where trial counsel failed to make an offer of proof, failed to cross-examine the only occurrence witness, and failed to present a coherent theory of defense; and where substitute counsel failed to order a trial transcript to prepare for post-trial motions; and (6) the conviction for armed violence must be vacated since there was only one physical act which formed the basis for the offenses.

For the reasons stated below, we affirm the conviction and sentence for murder and vacate the conviction and sentence for armed violence.

At trial the State called several witnesses. Anthony Crum testified that at 10:30 p.m. on December 31, 1984, his father, Odie Crum, who was the victim, picked up Anthony and drove to defendant's home. As Anthony and Odie entered the apartment, Anthony said hello to defendant. Odie asked defendant if she made the telephone calls she had to make. Defendant made no response. Anthony and Odie walked into the kitchen, where Odie took off his coat and hung it on a kitchen chair. Odie took off his shoulder holster, which held a gun, and placed the gun in the pocket of the coat hanging on the chair. Defendant then came into the kitchen and asked Anthony if he was staying the night. Anthony responded that he was, and defendant left the room.

Approximately 15 seconds later, defendant returned to the kitchen carrying a gun in her right hand. She pointed the gun at Odie and told him to "get out." Odie told defendant that the gun "won't settle anything," and defendant responded, "Get out." Odie grabbed defend-

ant's right arm with his left hand. Defendant was attempting to keep the gun away from him. Odie unsuccessfully tried to grab defendant's other arm. They began "wrassling" and moved into the dining room, a few feet away from the kitchen. Defendant was swinging her left hand, attempting to hit Odie. Neither defendant nor Odie said anything as they struggled into the dining room.

Anthony remained in the kitchen, since he did not know "whether she was intending on using it [the gun] or not." As he stood in the kitchen, Anthony heard a shot. He started for the dining room, and then stopped and went back to get the gun from his father's coat pocket. As Anthony was going into the dining room, he heard another shot. The second shot came within five to six seconds of the first shot. Anthony did not see who fired the shots. When Anthony entered the dining room, he saw Odie standing over defendant, who "was sort of laying on a slant on the couch." Odie's hands were on defendant's wrists, and the gun was still in defendant's right hand. Anthony pointed the gun he was carrying at defendant, and told her to drop her gun. Defendant then said to Anthony, "Shoot me, shoot me." Odie told Anthony not to shoot her. Anthony then pried the gun from defendant's hand, while Odie's hands remained on defendant's wrists. Anthony stated that he did not see any injuries on his father, but the victim held his chest and told Anthony to call the police. Anthony went into the kitchen to call the police. The victim went into the bedroom. Defendant ran out the back door.

Martin Tully, a Chicago police officer, testified that at 10:16 p.m. on December 31, 1984, he and his partners responded to a call of a man shot at defendant's address. As Tully approached the building, Anthony Crum was coming outside, carrying a plastic bag that held a gun. Tully escorted Anthony back into the apartment, and Tully saw defendant sitting at the feet of the victim between the hallway and bedroom. Defendant stated, "I shot him, I shot Odee [*sic*]." Defendant was arrested and advised of her *Miranda* rights. After waiving those rights, defendant made a statement to police.

Tully stated that defendant told police that when the victim came home that evening, she asked him to get out. The victim told her he did not have to leave since it was his house. Defendant got a gun from the nightstand in the bedroom and went to the kitchen, where the victim was. She pointed the gun at the victim and again told him to get out. The victim refused to leave and a struggle ensued. The victim grabbed defendant and the two wrestled into the dining room when a shot was fired. Defendant was thrown onto the couch and the victim grabbed her arms. As they were struggling, defendant heard

the gun go off a second time.

According to defendant's statement to the police, Anthony then approached defendant with a gun, put the gun to defendant's head, and told her to let go of the gun she was holding. Defendant told Anthony, "[G]o ahead and shoot me, I don't care." The victim took the gun from her and walked into the kitchen with it. The victim said, "Call the police, I'm shot." After seeing that the victim had been shot, defendant went upstairs and called an ambulance. When she returned to the first floor, the victim was lying on the bed. Anthony approached her and held her against a chest of drawers. The police then arrived.

Tully testified that when he entered the apartment, he saw the victim lying on his back on the bed. There was blood "all over" the victim's face and it appeared that two of the victim's teeth were missing. The victim appeared to have a gunshot wound at the upper right side of his mouth. Tully found no pulse on the victim, and called an ambulance. Tully also observed blood on the victim's chest and a cut in the web between the victim's index finger and thumb. The dining room floor had blood spatters on it, and there was a hole in the wall that appeared to be from a gunshot. A trail of blood led from the dining room to the kitchen. A .38 caliber gun covered with blood was on the kitchen table. The gun had been fired at least once and still contained a live round.

George Basile, a Chicago police detective, testified that he went to defendant's apartment some time after 10 p.m. on December 31, 1984. He was present in the apartment when the investigator opened the revolver found on the kitchen table. Two of the five cartridges were expended. The third round was not fired, but the primer was indented. Next to the indented round were two live rounds. Basile also was present at the police station when defendant gave a statement to an assistant State's Attorney, who prepared a written summary of defendant's statements. Defendant's statement of the incident was substantially the same as her statement to Officer Tully. Defendant told Basile that just after the shooting, she went upstairs and told her neighbors that she had a problem with her husband. Defendant stated that she never had any serious difficulty with her husband, although she had been arguing with him and having marital problems. Her husband never struck her. Defendant did not know what caused the problem that evening. Defendant also stated, however, that her husband did not let her go out or have friends over unless she told him first.

Michael McDermott, a Chicago police detective, testified that he arrived at defendant's apartment around 10:30 p.m. on December 31,

1984. At that time, defendant was in the apartment, clothed in a bathrobe. Defendant's clothing was not torn in any way nor did it have any blood stains. McDermott did not see any marks on defendant's person.

The parties stipulated to the testimony of two witnesses. If called to testify, Christine Kokocinski would state that she is a microanalyst for the Chicago police department. She performed microscopic examinations on the victim's shirt, and the tests did not reveal the presence of any gun powder residue. If called to testify, Richard Fournier would state that he is a firearms comparison and identification expert. He performed a test on the .38 caliber gun used by defendant, which test showed that gun powder residue was no longer appreciable at a muzzle-to-object distance of greater than 24 inches.

At the close of the State's case in chief, defendant moved for a directed verdict, which the trial court denied. Defendant then called nine witnesses who testified to defendant's good reputation in the community for honesty and peacefulness. Defense witness Zachary Ramey testified that he saw the victim carrying a gun numerous times and that the victim once pulled a gun on him. Defense counsel attempted to elicit testimony from Ramey that Ramey and others had borrowed money from the victim at high interest rates. The trial court ruled that defense counsel could not question the witness regarding an alleged "loan shark business."

Defendant testified in her own behalf. She and the victim were married in 1984. Defendant was 35 years old at the time of trial. The victim was 30 years older than defendant. Defendant stated that the victim was "extremely jealous" and would not let her leave the house without him. The victim did not want defendant to work. The victim always carried a gun. On two occasions defendant was frightened when the victim lay on the bed, talking to her and stroking a gun he took from the nightstand. One of those occasions was on the evening of the shooting. Defendant stated that the victim was a "loan shark," and she had accompanied him to collect money from people at his job and also at a lounge and a bar. Defendant related an incident when the victim became "furious" when someone did not pay him. Defendant stated that the victim had a temper and got "very violent." She also stated, however, that the victim would go only so far as to grab her and would not otherwise harm her.

Defendant stated that early in the day on December 31, 1984, she and the victim argued about a birthday cake and continued to argue on and off all afternoon. The victim told defendant that he did not want to attend a party they had planned to attend, because someone

had not repaid him some money owed. The victim demanded that defendant give him the money in her wallet and the tickets to the party. Defendant gave the victim one ticket and kept one. Defendant then called her sister to ask her to take defendant to the party. Her sister stated that there was no room in her car. Defendant called her sister again, requesting that her sister come and get her, apparently in an attempt to leave the presence of the victim. The victim heard defendant talking to her sister and told her that she was not going anywhere.

Defendant then left the house and ran for some distance. The victim chased her, and she returned home because she did not have any money. The victim left the house and later returned with his son Anthony. Defendant stated that she was scared, and thought about taking her own life, but she "couldn't do it." Defendant then went into the kitchen with the gun. Defendant's testimony regarding the shooting incident is substantially similar to her statement to Officer Tully. Defendant stated that when the victim grabbed her and threw her on the couch, the gun went off. The next thing she knew, Anthony put a gun to her head and told her to drop the gun she was holding.

On cross-examination, defendant stated that she and the victim bought the three-flat where they lived and that she collects the rents. She has access to two bank accounts jointly owned by her and the victim. She was the beneficiary of a life insurance policy of the victim worth $15,000. She stated that she was not afraid of the victim during the seven years she had known him, even though she knew he carried a gun. The victim never threatened or hit her with a gun.

Further, defendant did not see a gun in the victim's belt when he entered the apartment with his son. Defendant stated that the victim was pinning her down when the gun went off. She does not remember pulling the trigger. She was asking the victim to leave and she held the gun to help persuade him. She did not remember scratching the victim, and she did not know how the victim's teeth got knocked out. Defendant denied that she cut the victim's hand. She stated that she did not intend to kill or do great bodily harm to the victim. She thought that if the victim got the gun from her after the first shot he might shoot her. Defendant admitted that she did not tell police that she had tried to escape from the apartment earlier that day, nor did she tell police that she was afraid the victim would shoot her.

■■ ■ On appeal defendant contends that the evidence supports a self-defense theory, and therefore, her conviction for murder should be reversed and a new trial granted. Once the affirmative defense of

self-defense is raised in a case, the burden is on the prosecution to prove beyond a reasonable doubt that the force used was not justified, in addition to proving beyond a reasonable doubt each element of the offense charged. (*People v. Williams* (1974), 57 Ill. 2d 239, 311 N.E.2d 681, *cert. denied* (1974), 419 U.S. 1026, 42 L. Ed. 2d 302, 95 S. Ct. 506.) The requirements set forth in the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 1—1 *et seq.*) for determining whether the use of force is justified as self-defense are the following:

"(1) [T]hat force is threatened against a person; (2) that the person threatened is not the aggressor; (3) that the danger of harm is imminent; (4) that the force threatened is unlawful; (5) that the person threatened must actually believe: (a) that a danger exists, (b) that the use of force is necessary to avert the danger, (c) that the kind and amount of force which he uses is necessary; and (6) that the above beliefs are reasonable." (*People v. Kyles* (1980), 91 Ill. App. 3d 1019, 1021, 415 N.E.2d 499.)

(Ill. Rev. Stat. 1987, ch. 38, par. 7—1.) If the defendant is the aggressor, the use of deadly force is justified only if:

"(1) Such force is so great that he reasonably believes that he is in imminent danger of death or great bodily harm, and that he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the assailant; or

(2) In good faith, he withdraws from physical contact with the assailant and indicates clearly to the assailant that he desires to withdraw and terminate the use of force, but the assailant continues or resumes the use of force." Ill. Rev. Stat. 1987, ch. 38, pars. 7—4(c)(1), (c)(2).

In the instant case, the evidence is clear that deadly force was used. Defendant argues, however, that it was not her intent to kill her husband. Defendant asserts that the evidence indicates she did not shoot the victim immediately, although she had ample opportunity to do so, but rather requested several times that he leave the house. She shot the gun only after she and the victim began struggling and she believed that if the victim got the gun from her, he might shoot her. Defendant contends that the evidence shows her state of mind was such that she reasonably believed she was in danger of death or great bodily harm. She testified that her husband had a violent temper; that she and the victim were quarrelling on and off during the day of the shooting; and that the victim became angry over insignificant matters, such as a birthday cake.

As noted by the State, however, defendant admitted that she did

not see any gun on the victim prior to the shooting. Further, the victim never threatened or struck her in the past. In addition, the evidence indicates that defendant was the aggressor, since she was the one who carried and pointed the gun, requesting that the victim leave the apartment. Further, there is no evidence that defendant suffered any noticeable physical injuries during the altercation, and her clothing was not torn. The victim, on the other hand, suffered a cut to his hand in addition to the loss of two or more teeth, although the loss of teeth apparently resulted from the gunshot wound near the mouth. In addition, the stipulated evidence indicates that no gunshot residue was on the victim and that such residue is not present when the gun is fired from a distance of more than 24 inches.

■■ ■ In a bench trial, it is the province of the trial court to determine the credibility of the witnesses and weigh the evidence. The court's findings will not be disturbed on review unless the evidence is so unsatisfactory as to create a reasonable doubt as to the defendant's guilt. (*In re C.P.* (1986), 141 Ill. App. 3d 1018, 491 N.E.2d 44.) In the instant case the trial court rejected defendant's assertion that she reasonably believed that the use of deadly force was necessary. We find that the record supports the trial court's conclusion and therefore will not reverse defendant's conviction on the basis of self-defense. See *People v. Carter* (1985), 135 Ill. App. 3d 403, 481 N.E.2d 1012.

■■ Defendant contends in the alternative that her murder conviction should be reduced to voluntary manslaughter on the basis that the shooting occurred during the course of a "mutual combat." According to the statute in effect when defendant was indicted, a person who killed an individual without lawful justification committed voluntary manslaughter if, at the time of the killing, he was acting under a sudden and intense passion resulting from serious provocation. (Ill. Rev. Stat. 1983, ch. 38, par. 9—2(a)(1).) Mutual quarrel or combat is sufficient to support a finding of serious provocation. (*People v. Johnson* (1972), 4 Ill. App. 3d 249, 280 N.E.2d 764.) Mutual combat is one into which both parties enter willingly, or in which two persons, upon a sudden quarrel, and in hot blood, mutually fight upon equal terms. (*People v. Matthews* (1974), 21 Ill. App. 3d 249, 253, 314 N.E.2d 15.) A slight provocation, however, will not be adequate since the provocation must be in proportion to the manner in which the accused retaliated. This is especially true if the homicide was committed with a deadly weapon. (*Matthews,* 21 Ill. App. 3d at 253.) The question to be asked is whether there existed such provocation as would have caused the state of mind claimed in an ordinary person under the same circumstances. *Matthews,* 21 Ill. App. 3d at 252.

Defendant asserts that the circumstances surrounding the shooting in the instant case constituted a serious provocation for her actions. Defendant contends that the victim was larger in size and overpowered her, as shown, for instance, when he threw her onto the couch and was bending over her. Further, defendant had undergone a day of arguing with the victim, and the victim had a temper, sometimes would be violent, and always carried a gun. Defendant did not intend to fire the gun, and the victim grabbed her and began to struggle for the gun. Further, defendant remained at the apartment until the police arrived.

We find that the record fails to indicate that defendant and the victim were engaged in a "mutual combat" that would support a finding of serious provocation. Rather, defendant was the aggressor who approached the victim with a gun and ordered him to leave. The two were not fighting "on equal terms." (*Matthews*, 21 Ill. App. 3d at 253.) The evidence indicates that the struggle ensued when the victim attempted to take the gun away from defendant, and defendant and the victim wrestled into the dining room. The gun did not leave defendant's hand until two shots were fired and Anthony took the gun away. Defendant has failed to indicate that the facts surrounding the shooting justified her use of a gun against the victim. Therefore, we must reject defendant's argument.

Defendant also contends that the trial court erred in ruling that evidence of the victim's prior violent acts was inadmissible unless it was shown that defendant knew about the acts. Defendant concedes that she failed properly to preserve this issue by failing to object at trial and failing to raise the issue in her post-trial motion. Defendant requests this court to address the issue under the plain error doctrine (107 Ill. 2d R. 615(a)). Defendant concedes that defense counsel failed to make offers of proof at trial, but asserts "it can be inferred that the witnesses would have testified that Odie Crum had pulled a gun on people when he was angry with them."

We will address this issue in order to determine if plain error occurred. As stated by the supreme court in *People v. Lynch* (1984), 104 Ill. 2d 194, 470 N.E.2d 1018, the aggressive and violent character of a victim is admissible to support a theory of self-defense in two ways. First, a defendant's knowledge of the victim's violent tendencies may have affected the defendant's perception of and reaction to the victim's behavior. In such an instance, evidence of the victim's violent character is admissible only if the defendant knew of the victim's violent nature. Second, evidence of the victim's propensity for violence may support the defendant's version of the facts where there

are conflicting accounts of what occurred. In this instance, "the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may show it by appropriate evidence, regardless of when he learned of it." *Lynch*, 104 Ill. 2d at 200; see also *People v. Johnson* (1988), 172 Ill. App. 3d 371, 526 N.E.2d 611.

In *Lynch*, where the defendant was charged with murder and claimed self-defense, the supreme court found that the victim's prior convictions for battery should have been allowed. (*Lynch*, 104 Ill. 2d at 202.) The court stated that such evidence ordinarily is inadmissible to prove the offense charged because the danger of prejudice outweighs the relevance of the evidence. Where, however, the victim's propensity for violence is in question, the defendant may be prejudiced if such evidence, with its high degree of relevance and reliability, is excluded. See *Lynch*, 104 Ill. 2d at 201-02; see also *People v. Robinson* (1987), 163 Ill. App. 3d 754, 516 N.E.2d 1292.

In the instant case, the trial court ruled that evidence showing defendant knew the victim always carried a gun and had a violent nature was admissible, since it was relevant to show defendant's state of mind. The trial court, however, improperly excluded evidence of specific acts of violence by the victim, offered to show that the victim was the aggressor. We must determine whether the exclusion of such evidence resulted in reversible error.

■ Defendant asserts that the excluded evidence would have shown that the victim pulled his gun on one or more persons. Despite the trial court's ruling, evidence was presented that the victim nearly always carried a gun and once had pulled a gun on Zachary Ramey. Defendant testified to the victim's temper and stated that the victim became furious when people did not repay him money they owed him. Defendant testified that she became frightened when she saw the victim stroking his gun on two occasions. The trial court also heard defendant's testimony that the victim never struck her or pulled a gun on her, and that she was not afraid of the victim. The excluded evidence does not involve situations of which the trial court was unaware. Further, there was evidence presented to the court which, if believed, was sufficient to establish defendant's guilt beyond a reasonable doubt. Therefore, we hold that the exclusion of the evidence was harmless error. See *People v. Kline* (1982), 92 Ill. 2d 490, 442 N.E.2d 154; *People v. Robinson* (1987), 163 Ill. App. 3d 754, 516 N.E.2d 1292.

Defendant also asserts that she was denied a fair trial since the prosecution questioned witnesses regarding insurance policies and property of the victim where there was no evidence that the victim's

money provided a motive for the shooting, and since the prosecution argued that accident and self-defense were mutually exclusive defenses. We will address first the financial-motive argument. The prosecution questioned defendant regarding ownership of her apartment building; how much money she contributed to the purchase of the building; and who collected the rents. The prosecution also questioned her about property and bank accounts of the victim. The victim owned two life insurance policies, and defendant was the beneficiary of one of the policies, worth $15,000. In addition, the prosecution asked, during cross-examination of a defense witness, whether the victim had life insurance. In closing argument, the prosecution stated that defendant "found herself a sugar daddy with a whole bunch of money."

■ The State asserts that defense counsel failed to object to the prosecution's questions and argument at trial and failed to raise the issue in a post-trial motion, and therefore waived the issue. The record indicates that defense counsel did object at trial to a number of the prosecution's questions regarding the financial circumstances of the victim and defendant. The issue was not presented in defendant's post-trial motion, however, and therefore is waived. *People v. Williams* (1987), 155 Ill. App. 3d 332, 508 N.E.2d 444.

■ Even assuming, *arguendo*, that the issue was not waived, we find that it was not an abuse of the trial court's discretion to allow the prosecution wide latitude during cross-examination of the defense witnesses. (See *People v. Kline* (1982), 92 Ill. 2d 490, 442 N.E.2d 154.) The proper scope of cross-examination extends to matters raised on direct examination, including all matters which explain, qualify, or destroy the testimony on direct examination. (*People v. Hunter* (1984), 124 Ill. App. 3d 516, 464 N.E.2d 659.) Only where the court clearly has abused its discretion, resulting in manifest prejudice to the defendant, will a reviewing court interfere. *Kline*, 92 Ill. 2d at 504.

■ In the instant case, the prosecution's questions elicited information regarding the relationship between defendant and the victim and the relationships among the families of defendant and the victim. These questions were within the proper scope of cross-examination, as they were designed to shed light upon the events leading up to the shooting incident. Further, it was not improper for the prosecution to attempt to determine if there was a financial or other motive for defendant to want to harm the victim, where the prosecution established that defendant was the beneficiary of an insurance policy of the victim. See *People v. Mitchell* (1984), 105 Ill. 2d 1, 473 N.E.2d 1270, *cert. denied* (1985), 470 U.S. 1089, 85 L. Ed. 2d 153, 105 S. Ct. 1857;

*People v. Gougas* (1951), 410 Ill. 235, 102 N.E.2d 152.

Nevertheless, it was improper for the prosecutor to assert during closing argument that defendant considered the victim a "sugar daddy." (See *People v. Simms* (1988), 121 Ill. 2d 259, 520 N.E.2d 308.) We do not find, however, that the error committed constituted reversible error, particularly since this case proceeded as a bench trial, and since we find no indication in the record that the court relied on the comments in making a determination of guilt. We must assume that the trial court did not consider improper argument and considered only competent evidence in ruling on the merits of the case. *Simms*, 121 Ill. 2d at 269.

Defendant asserts that she was denied a fair trial also because the prosecution argued to the trial court that accident and self-defense were mutually exclusive affirmative defenses. In *People v. Robinson* (1987), 163 Ill. App. 3d 754, 516 N.E.2d 1292, the court reviewed existing case law regarding the apparent conflict between the two affirmative defenses. The court concluded, however, that there is no inherent conflict between the two defenses, but rather that the facts of a given case must determine whether these two defenses do in fact create a genuine conflict. (See *Robinson*, 163 Ill. App. 3d at 762.) In the instant case, defendant asserted that she did not intend to shoot the victim when she went into the kitchen with the gun pointed toward him; rather, she wanted to convince him to leave. When the victim grabbed defendant's arm, however, the situation changed, and defendant feared that the victim might take the gun from her and shoot her. Therefore, defendant asserts, she was acting in self-defense in an attempt to keep the gun from the victim, when the gun accidentally went off.

Under the analysis of *Robinson*, we find that it was permissible and not necessarily contradictory for defendant to present evidence of and argue both self-defense and accident. Therefore, the prosecutor improperly argued that the defenses were mutually exclusive. In this bench trial, however, we must assume that the trial court relied only upon proper evidence in reaching its determination on the guilt of defendant. The court heard evidence from the defense supporting both self-defense and accident theories. We find that the prosecutor's comment in closing argument failed to constitute reversible error. See *People v. Simms* (1988), 121 Ill. 2d 259, 520 N.E.2d 308.

Further, defendant asserts that she was denied the effective assistance of counsel, where trial counsel failed to make an offer of proof regarding the victim's prior violent acts; failed to cross-examine Anthony Crum, the only occurrence witness; and failed to present a

coherent defense. In addition, substitute counsel, who was retained at the sentencing hearing, failed to obtain a transcript of trial proceedings in order to prepare defendant's post-trial motion.

■■■ The determination of whether a party was denied effective assistance of counsel is to be made under the standard set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and adopted by the Illinois Supreme Court in *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061. Defendant must show: (1) that her counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that the result would have been different had there not been ineffective assistance of counsel. (*Strickland*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) The determination of the efficacy of representation requires consideration of the totality of the circumstances and the record as a whole. (*People v. Reese* (1984), 121 Ill. App. 3d 977, 460 N.E.2d 446.) A review of counsel's competency does not extend to those areas involving trial tactics or strategy, which are purely matters of professional judgment. *Reese*, 121 Ill. App. 3d at 984, citing *People v. Haywood* (1980), 82 Ill. 2d 540, 543-44, 413 N.E.2d 410.

■■■ In the instant case, we previously found that the trial court's ruling to exclude specific instances of the victim's prior violent acts did not result in reversible error. Similarly, we do not believe that defense counsel's making an offer of proof regarding the victim's prior violent acts would have resulted in a different outcome of defendant's trial. (See *People v. Lynch* (1984), 104 Ill. 2d 194, 470 N.E.2d 1018.) Therefore, we find that counsel's failure to make an offer of proof fails to constitute ineffective assistance of counsel.

Defendant claims that trial counsel also should have cross-examined Anthony Crum, an occurrence witness. While acknowledging that Anthony did not actually see the shooting, defendant asserts that counsel should have cross-examined him regarding his relationship with his father and defendant, and as to why he was leaving the apartment with his father's gun when the police arrived. Defense counsel's decision not to cross-examine the witness was a trial strategy which this court is not inclined to question. (See *People v. Reese* (1984), 121 Ill. App. 3d 977, 460 N.E.2d 446.) Further, while counsel's questioning Anthony Crum regarding those matters now raised by defendant may have clarified the circumstances surrounding the shooting and perhaps revealed more clearly Anthony Crum's participation in events before and after the shooting, defendant has not

shown that she was substantially prejudiced by counsel's failure to put forth such questions. Further, we do not believe that the result of the trial would have been different had counsel cross-examined Anthony Crum. There is no indication in the record that Anthony Crum would have exculpated defendant. Further, Anthony Crum was questioned extensively during direct examination regarding his knowledge of the event.

Defendant also asserts that trial counsel proceeded to trial advancing the defenses of self-defense and "psychologically abused housewife syndrome," while at the close of trial counsel argued self-defense and accident. Defendant asserts that counsel should have been more consistent as to theories of defense, and that counsel failed adequately to support the proffered defenses. The record indicates that during his opening statement, defense counsel asserted that the two defenses would be accident and self-defense, and that the psychological abuse of defendant by the victim was "one of the contributing factors" leading to the events surrounding the incident. Our review of the record indicates that defense counsel presented evidence, through the testimony of defendant, supporting each of the two proffered defenses, accident and self-defense. Further, while counsel's reference to the "psychologically abused housewife syndrome" may have been confusing to the jury regarding defendant's theory of the case, we do not find that counsel's statements or approach fell below a standard of reasonableness such that counsel's representation of defendant was ineffective under the *Strickland* standard.

Defendant also asserts that substitute counsel, who appeared at the sentencing hearing and prepared post-trial motions, failed to order a transcript of trial, resulting in a failure by counsel to preserve for review all trial errors. Specifically, defendant contends that counsel failed to assert that the trial court erred in refusing to admit evidence of the victim's prior violent acts, and that the prosecutor improperly argued a financial motive and that self-defense and accident were mutually exclusive defenses. We already have discussed these alleged trial errors and have found no substantial prejudice to defendant resulting from them. In view of our prior findings, we find that defendant has failed to show that the result of her trial would have been different had counsel ordered a transcript of proceedings.

Finally, defendant contends that if this court affirms the murder conviction, the court should vacate the conviction and sentence for armed violence, since there was only one physical act which formed the basis for both offenses. Defendant asserts that both convictions were based on defendant's use of a gun to shoot the victim.

In *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273, the court stated that a defendant is prejudiced where more than one offense is obtained from the same physical act. However, multiple convictions are permissible where a defendant has committed several acts, even if those acts are interrelated. (*King*, 66 Ill. 2d at 566.) The court held that when more than one offense arises from a series of incidental or closely related acts and the offenses are not lesser included offenses, convictions with concurrent sentences can stand. *King*, 66 Ill. 2d at 566.

 The State responds, and defendant concedes, that this issue was not properly preserved for appeal. We will address this issue, however, to determine whether plain error occurred. (See *People v. Williams* (1987), 155 Ill. App. 3d 332, 508 N.E.2d 444.) Armed violence is committed when a person, armed with a dangerous weapon, commits a felony (Ill. Rev. Stat. 1983, ch. 38, par. 33A—2), in this case, murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)). Armed violence is not a lesser included offense of murder. The State notes that defendant fired two shots and claims that each of the shots constitutes a separate act. We disagree.

 Since *People v. King* was handed down, the courts in Illinois have set forth several factors to be considered in determining whether conduct of a defendant constitutes separate acts or distinct parts of a single physical act. Those factors include: (1) whether there is an intervening event between the acts; (2) the time interval between the successive parts of the conduct; (3) the identity of the victim; (4) the similarity of the acts performed; (5) and whether the conduct occurred at the same location. In addition, prosecutorial intent, as indicated in the wording of the charging instrument, has been regarded as a significant factor for determining whether defendant's conduct should be treated as a single act. *People v. Williams* (1987), 155 Ill. App. 3d 332, 508 N.E.2d 444; *People v. Baity* (1984), 125 Ill. App. 3d 50, 465 N.E.2d 622.

In the instant case, the time interval between the shots was only five to six seconds, the shooting acts were similar, the conduct occurred in the same location, and there were no intervening events. Further, the indictment shows the State intended to treat the conduct of defendant as a single act. The indictment contains two counts for murder (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), (a)(2)) and one count for armed violence (Ill. Rev. Stat. 1983, ch. 38, par. 33A—2). In each count, the conduct alleged is that defendant "shot and killed Odie Crum with a gun." The State therefore failed to differentiate be-

tween the conduct supporting the murder charge from the conduct supporting the armed violence charge.

■■ ■ We conclude that defendant's shooting of the gun twice constitutes distinct parts of a single physical act. Therefore, it was improper to convict defendant of both armed violence and murder. Accordingly, we vacate defendant's conviction and sentence for armed violence. We affirm defendant's conviction and sentence for murder. We find that a remand for resentencing is unnecessary, as the record fails to indicate that the trial court was influenced in sentencing defendant on the murder conviction by the separate offense of armed violence with which defendant was charged. See *People v. Baity* (1984), 125 Ill. App. 3d 50, 465 N.E.2d 622.

For the foregoing reasons, we affirm the conviction and sentence for murder and vacate the conviction and sentence for armed violence.

Judgment affirmed in part and vacated in part.

McNAMARA* and RIZZI, JJ., concur.

---

*Justice McNamara participated in this opinion prior to his assignment to the sixth division.