(No. 62784.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DARRYL SIMMS, Appellant.

*Opinion filed January 25, 1988.—Rehearing denied April 5, 1988.*

260

MILLER, J., joined by MORAN, C.J., and WARD, J., specially concurring.

Charles M. Schiedel, Deputy Defender, and Robert D. Seeder and Gary S. Rapaport, Assistant Defenders, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart and Shawn W. Denny, Solicitors General, and Mark L. Rotert, Sally L. Dilgart, Scott Graham and Terence M. Madsen, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE SIMON delivered the opinion of the court:

After a bench trial in the circuit court of Du Page County, the defendant, Darryl Simms, was found guilty of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)), aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch.

38, par. 12—14(a)), criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—13(a)), armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2), home invasion (Ill. Rev. Stat. 1985, ch. 38, par. 12—11(a)) and residential burglary (Ill. Rev. Stat. 1985, ch. 38, par. 19—3(a)). Defendant continued to waive his right to a jury in the sentencing phase, and the circuit judge found the defendant eligible for the death penalty on the basis of multiple felony-murder convictions (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)). Finding no mitigating factor sufficient to preclude imposition of the death penalty, the judge sentenced the defendant to death. That sentence was stayed pending direct appeal to this court. Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603.

The victim, Lillian LaCrosse, was a 25-year-old woman who lived with her husband and three children, ages 2, 3 and 4, in a second-floor apartment in Addison, Illinois. On the evening of April 17, 1985, the electricity for the building had failed, and at about 9:30 p.m., Commonwealth Edison personnel arrived to work in the area outside of the victim's apartment. Until about 1:45, the apartment building was dark except for dim emergency lights in the hallways.

Because the victim's husband, Richard LaCrosse, had gone to work at 10 p.m., the victim was alone with her children during this blackout. When Mr. LaCrosse returned home at about 7:30 a.m., he found his children crying in their bedroom, the phone off the hook in the kitchen, and his wife's dead body on the dining-room floor. She had been stabbed at least 25 times in the ear, shoulder, throat, chest, arms and back. A pathologist testified that the wounds indicated that two different weapons were used, that the victim had also been strangled, and that the cause of death was exsanguination, or loss of blood. The victim's underwear had been removed, and evidence of sperm from the vaginal smear and expert

testimony indicated that someone other than Richard La-Crosse had engaged in sexual intercourse with the victim. There was also evidence presented at trial that the dresser drawer in the bedroom had been disturbed and that the victim's purse, a movie camera and a pair of jeans were missing.

The police investigation quickly focused on the defendant. In addition to receiving two anonymous telephone calls and hearing from Mr. LaCrosse that the defendant had been "harassing" the victim and asking her for dates, the police tracked a trail of blood from the back door of the LaCrosse apartment to the apartment in the adjoining building in which the defendant lived. In the early morning hours of April 19, the defendant's mother, Olivia Simms, and brother, Sherrod Simms, told the police that the defendant was staying at a family friend's house in Streamwood. The police obtained an arrest warrant for the defendant and executed a search warrant for his Addison apartment. The police found blood in the defendant's apartment and took a pair of jeans with blood stains on the right thigh area. The defendant was arrested at 4:30 a.m. outside his friend's house in Streamwood.

Officer Tom Gorniak testified that the defendant offered three different accounts of his actions during the early morning hours of April 18. When Gorniak asked the defendant how he had gotten a cut on his right thigh, the defendant explained that he had cut himself while cutting potatoes. After Gorniak told the defendant that he thought this explanation was unlikely, the defendant said that he had actually been stabbed during a fight in Chicago. Then, after Gorniak informed the defendant that Sherrod Simms had told police that Darryl had stabbed the victim and that blood had been found in Simms' apartment, the defendant said he would tell the truth.

In a statement that was reviewed twice in the presence of either another officer or the State's Attorney, the defendant admitted killing Mrs. LaCrosse, but claimed that he acted in self-defense. The defendant's story was that he had been having an affair with Mrs. LaCrosse and that they had had sexual intercourse 18 to 20 times in the past month, the last time during the afternoon of April 17. Defendant told Gorniak that he had gone to Mrs. LaCrosse's apartment at around midnight after she called to him from her balcony. Defendant stated that after the victim let him into the apartment, he fondled the victim, and that Mrs. LaCrosse became upset when he told her he had to leave. He explained that after he had telephoned his mother to tell her he was on his way to her home in Bellwood, the victim stabbed him in the leg with a knife. In struggling with her, he stabbed her in the neck. When the victim screamed, he choked the victim until she was unconscious. He also told Officer Gorniak that he had tried to remove her clothing and wipe her with a towel in order to remove any fingerprints. And because he realized he would go to jail for a "long time" if he was identified and convicted of attempted murder, the defendant said that he had stabbed her in the neck and throat more than 10 times, knowing that these wounds would kill her. Defendant said that before he left through the back door, he took the victim's purse and movie camera, because he feared he had left fingerprints on them the previous afternoon.

Defendant also told Gorniak that after he had attempted to bandage his wound in his apartment, he drove with his girlfriend and his brother to his mother's home in Bellwood. His mother then drove him to the hospital, where four or five stitches closed the cut on his leg, which he told hospital personnel had resulted from a potato-cutting accident.

The defendant did not testify at trial, and his defense consisted of arguments that his statement to police was taken in violation of his *Miranda* rights and therefore must be suppressed, and that the State had failed to prove beyond a reasonable doubt that the defendant had entered the victim's apartment without authority. Considering the testimony of several officers that the defendant had been informed of his *Miranda* rights prior to interrogations, and the evidence that he signed a waiver of his *Miranda* rights to have counsel present, the circuit judge denied the defendant's motion to suppress his confession. The judge found the defendant guilty on nine counts of murder, six counts of aggravated criminal sexual assault and five counts of residential burglary, and the State then asked for the death penalty.

In the first stage of the sentencing hearing, the trial judge found the defendant eligible for the death penalty because he was over 18 years of age at the time of the murder and had been convicted of killing the victim in the course of a felony (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)). During the second stage of the sentencing hearing, the State presented evidence in aggravation, including evidence of 8 juvenile delinquency charges, 5 station adjustments, and 12 felony charges. The State showed that since May 1980, the defendant pled or was found guilty of two burglary charges, aggravated battery, two weapons offenses and other violations of probation. Further evidence in aggravation was received from three women who testified that on separate occasions each of them had been raped and battered by the defendant, one such attack occurring only eight days prior to Mrs. LaCrosse's death.

The State also presented evidence that the defendant was a member of the Black Gangster Disciples street gang at the time of his arrest. In addition, over the de-

fense counsel's continuing objection, the victim's parents, her husband and her brother gave victim impact statements, attesting to the trauma and grief that the victim's family endured.

In mitigation, the defense adduced testimony of various friends and relatives to the effect that the defendant was of good character and could be rehabilitated. The defense also presented evidence that he had written a poem, was a good singer and enjoyed cooking. Reviewing the statutory mitigating factors (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)), the circuit judge found none applicable to the defendant. Specifically, the judge ruled:

> "In reviewing all of the, all of the evidence, considering all of the factors in mitigation, all of the factors in aggravation, giving very little weight to the victim[ impact] statements *** I find that there are no mitigating factors sufficient to preclude the imposition of the death penalty."

## THE CONVICTIONS

The defendant first argues that he was denied a fair trial because the State's closing argument asked the court to find the defendant guilty "on behalf of families like the LaCrosses." Defendant claims that the following dialogue, occurring at the end of the prosecutor's rebuttal argument in the trial phase, was so inflammatory that it prevented the circuit judge from fairly deciding whether or not the defendant was guilty:

> "MR. TELANDER: Judge, on behalf of families like the LaCrosses, where the husbands are working two jobs, that have to leave their wives home at night—
>
> MR. WOJCIK: Judge, I will object as to the effect of the family.
>
> THE COURT: What is your objection?
>
> MR. WOJCIK: As to the society's effect.
>
> MR. TELANDER: Judge, I have a right to—
>
> THE COURT: *You can argue the facts in evidence.*

MR. TELANDER: Judge, on behalf of families like the LaCrosse's who have to work two jobs to make something out of their names—

MR. WOJCIK: Objection, Judge.

MR. TELANDER: And leave their wives home at night—

MR. WOJCIK: Judge, he is not arguing the evidence.

MR. TELANDER: We ask you to find the defendant guilty."

The defendant cites *People v. Hope* (1986), 116 Ill. 2d 265, and *People v. Bernette* (1964), 30 Ill. 2d 359, to support his argument that the trial judge committed reversible error. In *Hope* we emphasized that "the holding reached in each case dealing with reference to a murder victim's family will depend upon how such reference comes about." (*Hope*, 116 Ill. 2d at 278.) In both *Hope* and *Bernette* "the defendant's conviction was reversed because there were numerous references throughout direct testimony and argument to the jury regarding the murder victim's young children." (*Hope*, 116 Ill. 2d at 279.) Unlike the situation in either *Hope* or *Bernette*, the defendant in this case complains only of an isolated improper reference to the victim's family.

In this case, some reference to the victim's family during the trial was not only proper, but virtually inevitable. The victim's husband found his three children crying at the same time he found the victim. And the victim's parents' testimony, that they had been with the victim and her children throughout the day on which the defendant claimed to have had consensual sexual intercourse with the victim, was very important to the State's case. This is not a case where reference to a victim's family was an improper appeal to emotion with no relevance to the defendant's guilt or innocence.

Significantly, the defendant's only objection to the references to the victim's family concerned the State's closing argument. As we have previously noted:

"Attorneys are allowed considerable leeway in making closing and rebuttal arguments. 'The character and scope of argument to the jury is left very largely to the trial court, and every reasonable presumption must be indulged in that the trial judge *** properly exercised the discretion vested in him.' " (*People v. Morgan* (1986), 112 Ill. 2d 111, 131, quoting *People v. Smothers* (1973), 55 Ill. 2d 172, 176.)

This presumption is bolstered in this case by the fact that this was a bench trial, and in his findings in the guilt phase of the trial, the circuit judge did not rely on, or even refer to, the effect of the crimes on the victim's family.

To accept defendant's argument in this case would be tantamount to abandoning our previous observation that "every mention of a deceased's family does not *per se* entitle the defendant to a new trial" (*Hope*, 116 Ill. 2d at 276). Additionally, it would be inconsistent with our prior opinions that affirm convictions despite incidental references to a victim's family. (See, *e.g.*, *People v. Jordan* (1967), 38 Ill. 2d 83, 91-92; *People v. Brown* (1964), 30 Ill. 2d 297, 303; *People v. Golson* (1965), 32 Ill. 2d 398, 409.) In sum, we find neither reversible error nor any merit to defendant's claim that he was denied a fair trial because the trial judge failed to sustain defense counsel's objection to the State's reference to the victim's family in closing argument. We therefore affirm defendant's conviction for murder.

Defendant also contends that the State failed to prove beyond a reasonable doubt that he was guilty of home invasion and residential burglary because it did not prove that defendant entered the victim's apartment without authority. Mr. LaCrosse testified that his wife

kept the doors and windows locked and would not open the door for strangers, and no evidence was introduced that proved that the defendant had forced his way into the victim's apartment. But this court has previously held that the "absence of physical signs of forced entry does not necessarily indicate that an entry was consented to." *People v. Holman* (1984), 103 Ill. 2d 133, 158.

In this case there is ample evidence to infer that the defendant's entry was unauthorized. Mr. LaCrosse testified on redirect examination that he told the police that his wife had complained over the past two months that the defendant had been harassing her by asking her for dates. Because the electricity was out, the halls were only dimly lit, the outer door to the victim's building was open, and Commonwealth Edison personnel were working in the vicinity of the victim's apartment. Given that there was a blood stain on the victim's front door and evidence of defense wounds on the victim's hands, it is reasonable to infer that the victim was tricked into opening the door but never authorized an entry.

Compared to the strength of the inference of entry by deception or other unauthorized entry, the evidence of consensual entry was extremely weak. In the defendant's custodial statement, he claimed that he entered the victim's apartment to pay a social visit. In that statement the defendant also claimed to have had sexual intercourse with the victim on the afternoon of April 17. The victim's parents both testified that they were alone with the victim and their three grandchildren the whole day. That same custodial statement included unsupported claims that defendant and the victim had been having an affair for over a month. Considering also that defendant offered two other patently false accounts of his activities during the early morning hours of April 18, the trial judge was entitled to discount the credibility of the

defendant's story of his consensual entry into the victim's apartment. Because we believe that the prosecution presented ample evidence to enable the trial judge to conclude beyond a reasonable doubt that the defendant was guilty of residential burglary and home invasion, we affirm defendant's convictions of both crimes.

## THE DEATH SENTENCE

The defendant advances a series of arguments challenging the imposition of the death sentence. In particular, he argues that he was denied a fair sentencing hearing by the admission over defense counsel's objection of victim impact statements of the victim's parents, brother and husband. In support of this argument, the defendant cites *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529. In *Booth,* the Supreme Court reversed a death sentence and held that presentation at a capital sentencing hearing of evidence of the victim's personal traits, and of the impact of the crime on the victim's family violates the eighth amendment proscription against cruel and unusual punishment. Because victim impact evidence "may be wholly unrelated to the blameworthiness of a particular defendant" (*Booth v. Maryland,* 482 U.S. at 504, 96 L. Ed. 2d at 449, 107 S. Ct. at 2534), the Court held that admission of victim impact statements "creates an impermissible risk that the capital sentencing decision will be made in an arbitrary manner" (*Booth v. Maryland,* 482 U.S. at 505, 96 L. Ed. 2d at 450, 107 S. Ct. at 2534).

The Supreme Court has also made it clear that *Booth* applies retroactively to cases currently pending in which victim impact evidence was admitted. See *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708 (new constitutional principles pertaining to criminal prosecutions must be applied retroactively to all

cases pending direct review, even if the new rule is "a clear break with the past").

The State argues that the defendant has waived the *Booth* issue on review by failing to raise it in a post-trial motion. And if it is not waived, the State contends that because the trial court gave "very little weight" to the victim impact evidence, the error of admitting this evidence was harmless.

Assuming this is a case to which it is fair to apply the waiver doctrine, we believe that the consideration of victim impact evidence in this case was a plain error that affects substantial rights. Under this court's own rules (107 Ill. 2d R. 615(a)), and precedents (see, *e.g.*, *People v. Adams* (1985), 109 Ill. 2d 102, 128), plain errors are reviewable by this court. Furthermore, relaxing the application of the waiver rule where fundamental constitutional rights are at stake is consistent with both our own and Supreme Court precedents. See, *e.g.*, *Johnson v. Zerbst* (1937), 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, 1023; *People v. Haskell* (1968), 41 Ill. 2d 25, 31.

That this case involves "[p]lain errors or defects affecting substantial rights" (107 Ill. 2d R. 615(a)) cannot be disputed. Four of the victim's family members testified to their grief and deep sense of loss during the sentencing hearing. Mr. LaCrosse testified as to his shattered dreams and his concerns over raising his three children without their mother. The statements of the parents expressed how desperately they missed their daughter and how painful it was to hear their grandchildren ask "Na Na, where is my mommie?" The victim impact evidence in this case is simply too powerful for a human sentencer to ignore. More explicitly, the trial judge admitted that the impact on the victim's family was a consideration in his sentencing decision. Under *Booth*, admitting this type of evidence at a capital sen-

tencing hearing clearly violates the defendant's eighth amendment rights.

A similar situation was presented in *People v. Adams* (1985), 109 Ill. 2d 102. There, a jury was permitted to consider an improper aggravating factor in the capital sentencing hearing. Our opinion in that case applies as well to consideration of victim impact statements:

"It had no proper relevance to either phase of the death sentencing hearing. We cannot say that the jury's deliberations and verdict were uninfluenced by the improper argument. The defendant's death sentence must be vacated and the cause remanded for a new hearing on the sentence to be imposed.

As stated above, the comments we have described were not objected to, but considering the evidence here, the serious character of the error, and that the jurors voted to impose the death penalty, we will recognize them as plain error." (*Adams*, 109 Ill. 2d at 128.)

Arguments that this case involves plain error are even more compelling than those in *People v. Adams*. In *Adams* the trial court erred in allowing consideration of an aggravating factor that this court found statutorily improper (*Adams*, 109 Ill. 2d at 127), whereas this case involves the consideration of an aggravating factor that the Supreme Court has found constitutionally impermissible. In addition, the defendant did object at trial to the admission of victim impact evidence. Therefore, holding to our precedent in *People v. Adams*, we should find that this case also falls within the plain error exception to the waiver doctrine.

Finding plain error in this case is also consistent with our prior holding that " '[t]he doctrine of plain error may be invoked in criminal cases where the evidence is closely balanced or where the error is of such a magnitude that the accused is denied a fair trial.' " (*People v. Friesland* (1985), 109 Ill. 2d 369, 375, quoting *People v.*

*Black* (1982), 107 Ill. App. 3d 591, 593.) In *Booth* the Supreme Court found that admission of victim impact evidence was of such a magnitude that defendant was denied a fair sentencing hearing; it did not attempt to weigh the aggravating and mitigating factors itself. Nor should we attempt to recapture the trial judge's thinking when he balanced the aggravating and mitigating factors.

The State argues that, because the judge stated that he was giving "very little weight to the victim's statements," the error was harmless. But the State's argument reveals a misunderstanding of both *Booth* and the harmless-error doctrine. *Booth* decided that "the Eighth Amendment prohibits a capital sentencing jury from considering victim impact evidence." (*Booth v. Maryland*, 482 U.S. at 501-02, 96 L. Ed. 2d at 448, 107 S. Ct. at 2532.) Not only did the capital sentencer in this case consider victim impact evidence, he gave it some weight in his decision to sentence the defendant to death.

We note that the Supreme Court has never applied the harmless-error doctrine to affirm a capital sentence challenged on the basis of constitutional error in the sentencing phase. (See Comment, *Deadly Mistakes: Harmless Error in Capital Sentencing*, 54 U. Chi. L. Rev. 740, 748 (1987).) A possible explanation for this is that in capital sentencing, where a sentencer's discretion in weighing the aggravating and mitigating factors is quite wide, the predicate for harmless-error review—an ability to ascertain the impact of an error on the decision maker—is missing. (54 U. Chi. L. Rev. at 749-58.) Unlike a verdict of guilt or innocence, sentencing decisions often involve subjective factors. The sentencer is given such wide discretion to dispense mercy that it is risky to presume to know how great an influence, conscious or subconscious, a victim impact statement admitted in evidence had on the sentencer. And the Supreme Court has

recognized that where a reviewing court cannot confidently conclude that an error had no effect on the sentencing deliberations, it should not find errors in sentencing hearings harmless. For example, in *Skipper v. South Carolina* (1986), 476 U.S. 1, 90 L. Ed. 2d 1, 106 S. Ct. 1669, where a death sentence was reversed because the trial court excluded mitigating evidence of the defendant's good behavior in prison, the Supreme Court rejected the harmless-error argument because it could not "confidently conclude that credible evidence that petitioner was a good prisoner would have had no effect upon the jury's deliberations." (*Skipper v. South Carolina*, 476 U.S. at 8, 90 L. Ed. 2d at 9, 106 S. Ct. at 1673.) The Court went on to find:

> "it appears reasonably likely that the exclusion of evidence bearing upon petitioner's behavior in jail (and hence, upon his likely future behavior in prison) may have affected the jury's decision to impose the death sentence. Thus, under any standard, the exclusion of the evidence was sufficiently prejudicial to constitute reversible error." (*Skipper v. South Carolina*, 476 U.S. at 8, 90 L. Ed. 2d at 9, 106 S. Ct. at 1673.)

Similarly, given the powerful emotions expressed in the victim impact statements, we believe that it is reasonably likely that the circuit judge's consideration of this evidence may have affected his decision to impose the death sentence. It is therefore improper for us to find the error in this case harmless because we have no way of telling whether it was harmless or not.

The inappropriateness of using the harmless-error doctrine in this case is apparent when one considers the basis of both harmless-error rules in general and the rule set forth in *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, for constitutional error, in particular. Harmless-error rules are based on the notion that a defendant's interest in an error-free trial

must be balanced against societal interests in finality and judicial economy. Because the defendant's interests are heightened where constitutional error is at issue, the *Chapman* harmless-error standard shifts to the State the burden of proving "beyond a reasonable doubt" that the error did not affect a given decision (See generally Comment, *Deadly Mistakes: Harmless Error in Capital Sentencing*, 54 U. Chi. L. Rev. 740, 744-46 (1987)). In a death sentence hearing the defendant's interests are at their peak because the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." (*Lockett v. Ohio* (1978), 438 U.S. 586, 604, 57 L. Ed. 2d 973, 989, 98 S. Ct. 2954, 2964.) In this case, because *Booth* holds that consideration of victim impact evidence is constitutional error, under *Chapman* the State has the burden of proving beyond a reasonable doubt that the trial judge's weighing of victim impact evidence did not affect his decision to impose the death penalty. We do not believe that the State has met this burden here, and hence we cannot find the circuit judge's error harmless. We therefore reverse the death sentence and remand to the circuit court for a new sentencing hearing.

*Convictions affirmed; sentence reversed and remanded to the circuit court.*

JUSTICE MILLER, specially concurring:

I join the court in affirming the defendant's convictions, and I join that part of the majority opinion holding that the State has failed to show that the error in the introduction of the victim impact evidence at the death penalty hearing (see *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529) was harmless beyond a reasonable doubt (see *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824).

Before reaching that conclusion, however, the majority suggests that the harmless-error doctrine may never be used in reviewing constitutional errors occurring in death penalty proceedings (121 Ill. 2d at 275), and I do not join that part of the opinion.

The Supreme Court has found constitutional error occurring in the guilt-or-innocence portion of a capital trial to be harmless under *Chapman* in certain circumstances (see, *e.g.*, *Burger v. Kemp* (1987), 483 U.S. 776, 782 n.5, 97 L. Ed. 2d 638, 650 n.5, 107 S. Ct 3114, 3119 n.5), and I believe that the same principle should apply to the sentencing portion of the proceeding as well. Therefore, I see no point in scolding the State for what the majority perceives to be the State's "misunderstanding of both *Booth* and the harmless-error doctrine." (121 Ill. 2d at 274.) The State's argument that the error occurring here may be deemed harmless, in an appropriate case, is indeed consistent with Supreme Court precedent on this subject; it is the majority's analysis that goes astray.

The majority first asserts that the Supreme Court has never affirmed a death sentence under the harmless-error doctrine for constitutional errors and then posits, as "[a] possible explanation" for that, the supposed inability of a reviewing court to determine the effect of an error on the sentencing judge or jury. (121 Ill. 2d at 274.) It should be noted, however, that the Court has never held that harmless-error analysis is not appropriate in these circumstances, and that the majority's "explanation" is not only hypothetical, but also misleading. The Court, in discussing an allegation of constitutional error at a death penalty hearing, said, "[The State] has made no attempt to argue that this error was harmless, or that it had no effect on the jury or the sentencing judge. In the absence of such a showing our cases hold that the exclusion of mitigating evidence of the sort at issue here

278

renders the death sentence invalid." (*Hitchcock v. Dugger* (1987), 481 U.S. 393, 399, 95 L. Ed. 2d 347, 353, 107 S. Ct. 1821, 1824.) *Hitchcock* thus suggests that the harmless-error doctrine is in fact applicable to constitutional errors occurring in capital sentencing proceedings; at the least, the Court has not yet foreclosed its application, nor should we. I, therefore, do not join in that portion of the opinion that suggests that the harmless-error doctrine may never be used in reviewing constitutional errors occurring in death penalty proceedings. Because the majority opinion goes on to test the constitutional error that occurred at the defendant's sentencing hearing against the harmless-error standard set out in *Chapman,* I join the result reached by the majority.

MORAN, C.J. and WARD, J., join in this special concurrence.