# Illinois Official Reports

## Appellate Court

---

### *People v. Bever*, 2019 IL App (3d) 170681

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHNATHON R. BEVER, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-17-0681 |
| Filed | March 18, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Rock Island County, No. 08-CF-794; the Hon. F. Michael Meersman, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Peter A. Carusona, and Sean Conley, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>John L. McGehee, State's Attorney, of Rock Island (Patrick Delfino, David J. Robinson, and Nicholas A. Atwood, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE SCHMIDT delivered the judgment of the court, with opinion.<br>Justice Carter concurred in the judgment and opinion.<br>Justice McDade dissented, with opinion. |

**OPINION**

¶ 1    Defendant, Johnathon R. Bever, argues that plain error occurred when the judge considered matters outside the record—namely, his son's Army experiences—in determining defendant's guilt. We affirm.

¶ 2                                  I. BACKGROUND

¶ 3    The State charged defendant with criminal sexual assault (720 ILCS 5/12-13(a)(2) (West 2008)) in that he placed his penis in the vagina of K.R. while knowing that K.R. was unable to give knowing consent.

¶ 4    The matter proceeded to a bench trial in Rock Island County circuit court. K.R. testified that she attended a party at Adam Struve's house on the evening of July 12, 2008, and the early morning hours of July 13, 2008. K.R. drank alcohol at the party and became intoxicated. There were parts of the party that K.R. did not remember, and she assumed that she passed out or blacked out during those times. K.R. did not recall talking with defendant, dancing with anyone, or flirting with anyone.

¶ 5    K.R. remembered waking up in the basement on a mattress in a dark room. She did not know how she got there. She was not wearing clothing, but she did not remember taking her clothes off. K.R. saw two bright lights "like from a cell phone or something like that." K.R. heard the voices of two or three people in the room. She did not know who they were. A man was on top of K.R. having sexual intercourse with her. She heard someone else say to remove her tampon, and then someone removed it. The man on top of her continued having sexual intercourse with her. Someone tried to place his penis into her mouth, and she pushed it away. K.R. did not recall saying no. She said that she was "out of it" and did not know what to do.

¶ 6    Eventually, K.R. heard her friend, Veronica Morse, yelling her name. K.R. yelled back. Veronica came downstairs and turned the light on. The men ran out of the room. K.R. sat on the mattress and cried. Angie Kight, another friend of K.R., found K.R.'s clothes, and K.R. got dressed. K.R. told her friends she had sexual intercourse and did not know how it happened. K.R. left the party and spent the night at Morse's house. The next day, K.R. went to the hospital, where a nurse examined her. K.R. also spoke with a police officer at the hospital.

¶ 7    Morse testified that she was at Struve's party with K.R. Morse saw K.R. flirt with defendant and sit on his lap. K.R. seemed intoxicated but coherent at that time. After they had been at the party for approximately 90 minutes, Morse could not find K.R. Other people at the party told Morse that K.R. was in the basement. Morse went downstairs. As she was walking down the stairs, Anthony Nache and Nate Warden ran up the stairs. Morse found K.R. crying in a room in the basement. K.R. was partially undressed. K.R. said that two people had video recorded her having sexual intercourse with another man. One of the men removed her tampon. Morse did not remember K.R. saying that she had sexual intercourse against her will, but K.R. was "freaking out," and "she seemed like she was in that state where they did it against her will." Morse helped K.R. put her clothes on. Morse then went upstairs and told Struve what K.R. had told her. Morse and K.R. left the party.

¶ 8    Kight testified that she was at the party with Morse and K.R. Kight believed that K.R. drank "more [alcohol] than she could handle" at the party. Kight saw K.R. talking to defendant and dancing with Nache. At one point, Morse told Kight that K.R. was downstairs claiming

someone had raped her. Kight went downstairs. Kight asked K.R. if someone forced her to have sexual intercourse, and K.R. said no. K.R. said that she had sexual intercourse with someone, heard voices, and then saw a light. K.R. thought the light might have been from a cell phone and that someone might have recorded her. K.R. did not know for sure what happened. K.R. was crying, and she seemed confused. Kight went upstairs and talked to Warden, Nache, and defendant. Kight checked the cameras on their cell phones to see if they had any photographs of K.R., but they did not. Defendant told Kight that he had sexual intercourse with K.R. but he did not force her. Defendant said that K.R. said she wanted to have sexual intercourse with him.

¶ 9 Justin Kapinus testified that he was a federal agent with the United States Army Criminal Investigation command. Kapinus received a request for assistance from the Moline Police Department to interview defendant, who was a private in the Army at the time, regarding a sexual assault. Kapinus met with defendant at an interview room on the installation where defendant was undergoing basic training, which was located in Fort Sill, Oklahoma. Someone from defendant's unit transported defendant to Kapinus's office building. Defendant would not have been given a choice as to whether he went to Kapinus's building. During the interview, Kapinus spent approximately one hour building a rapport with defendant. Kapinus then presented defendant with a form discussing defendant's *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)). Kapinus discussed the form with defendant. Defendant said he understood the form and signed it at 4:28 p.m. Defendant wrote his initials next to the date and time on the form. The court admitted the form into evidence.

¶ 10 Kapinus said that when he would interview people, they would not "memorialize the interview on a sworn statement" until they had "come to an agreement that there's nothing else to discuss." At that point, Kapinus would ask the individual to write in his or her own words what he or she had discussed with Kapinus. Kapinus would then "proceed with questions and answers that clarify what has maybe been left out or may be up for question." Kapinus followed that procedure in this case. That is, Kapinus spoke with defendant for a period of time, and defendant then wrote a statement.

¶ 11 The court admitted defendant's statement into evidence. Kapinus testified that defendant typed the statement himself except for a "Q and A" portion of the statement, which Kapinus typed. The part of the statement defendant typed stated:

> "On the morning of July 13 at approximately two o'clock am [I] was met by a girl that I had talked to for a short time earlier in the night. She told me that she needed to find a quite [*sic*] place to lie down. We were both inebriated her more so than me. I brought her down stairs to a room formerly occupied by my friend who had just recently moved out of the house at which this took place. All of the lights in the room were out. It was my going away party and there was a lot of pressure on me to have sex before I left for basic training. After laying the girl down I laid down and fell asleep for about 5 min[utes]. I woke up and saw an opportunity which I regrettably took. I started to kiss her when two men entered the room and didn't help the situation with encouragement about how I was being a man and how this was a good thing. I placed my hand down her shorts and shortly there after [*sic*] felt another hand on the back of mine. It turned out to be one of the other people in the room. As that went on she mumbled that she wanted me to stop but in the state of mind that I was in I did not think anything of it, however she did say it two more times. I then heard behind me *** that

- 3 -

I should start having sex with her. At this point I took off her shorts and someone else removed her shirt and underwear. I then began to have sex with her. As I was having sex with her I heard some one [*sic*] say to take her tampon out. To this I also paid no attention. Soon after I was told to stop by the other person and he took the tampon out. This should have told me that she did not know what was going on but I continued to have sex with her. After about three more minutes I saw one of the other two people move her head and stick his penis in her mouth. I know this because the room was illuminated by a cell phone. Her eyes were closed but I didn't think anything about it at that time, this was however another sign that she was not conscious and consenting. The cell phone went out but he continued to do this for approximately three minutes. Another five or six minutes went by and I finally realized what I was actually doing. I heard a voice from behind me say welcome to the unit and then I knew that I had to stop. I exited the room and did not look back. I was upstairs for about ten minutes when I heard one of the girls' friends' [*sic*] begin to yell at the other two who were in the room with me, who were then upstairs at the time. I then realized the entire severity of my actions on top of the pain I felt from my conscience. ***. I am incredibly sorry about what has been done and want to state that this is not the type of person that I am. I was affected by alcohol and made a horrible decision. If I could take back the past month of my life in order to prevent this situation I would do it in a heart beat."

¶ 12 In the "Q and A" portion of the statement, defendant said that Nache and Warden were also in the room during the incident.[1] Defendant believed the girl had consumed alcohol because "[h]er eyes were low, she had a hard time standing up, and she slurred her speech." Defendant said that the girl used him to hold herself up as they walked downstairs. Defendant said that the girl said to stop after he put his finger in her vagina and she was asleep when he inserted his penis into her vagina. Defendant said that no one held the girl down because she was incapacitated and they did not need to. Kapinus testified that defendant said that K.R. had told him to stop twice when he was digitally penetrating her and once while he was having sexual intercourse with her.

¶ 13 Kapinus testified that defendant "was receptive towards the whole interview." Defendant did not "combat *** pretty much any of the information [Kapinus] provided him." Kapinus stated: "Obviously, [defendant] didn't come out with the details. I had to assist him with that, but—and ask those questions ***." Kapinus testified that he stopped the interview when defendant disclosed that there were other men in the room while he was having sexual intercourse with K.R. Kapinus "advised [defendant] for conspiracy." Defendant then signed a second form waiving his *Miranda* rights at 7:48 p.m. The court admitted that form into evidence. The form showed that defendant had signed it and had written his initials by the date and time.

¶ 14 Kapinus testified that, after the hour of rapport building, the interview lasted for approximately 5½ hours. Defense counsel asked Kapinus why it took so long to elicit information from defendant that other individuals were involved in the offense. Kapinus replied that the interviewing process was "a long process." Kapinus testified that he wore civilian clothing during the interview. Kapinus did not tell defendant his rank.

---

[1]In the portion of the written statement that Kapinus typed, Kapinus referred to Warden as "Ward." However, Kapinus referred to Warden as "Warden" during his trial testimony.

¶ 15    The State rested.

¶ 16    Struve testified that defendant was one of his best friends. Struve hosted a going-away party for defendant before he left for basic training. Struve said that "it seemed like [K.R.] *** had a thing for [defendant] that night." K.R. sat on defendant's lap, and Struve had a conversation with defendant while K.R.'s hand was on defendant's "crotch area." At one point, defendant asked Struve if there was still a bedroom in the basement from when Struve's former roommate lived there. Struve said yes. Struve then watched K.R. lead defendant "hand in hand, down the stairs." Struve said that "a couple other gentlemen" also went downstairs. At one point, Morse came upstairs screaming hysterically. Struve went down to the basement and talked to K.R. Struve asked K.R. if she had sexual intercourse with defendant, and she said yes. Struve asked K.R. what was wrong, and she said that more than one person tried to have sexual intercourse with her.

¶ 17    Struve testified that he was also in the Army at the time of the party. Struve testified that he had gone through basic training. Defense counsel asked Struve what basic training was like, and the State objected on the ground that it was irrelevant. The court stated: "Well, I'm assuming it's in relation to showing what [defendant's] basic training was like, what all grunts go through when they go into basic training, which I could testify about my own son, but it's overruled." Struve testified that basic training was strenuous and stressful, and he was scared at some points. Struve stated that drill sergeants were demanding. Their job was to scare the new recruits and break them down. Defense counsel asked Struve if he was afraid of his drill sergeant, and the State objected on the ground that it was irrelevant. The following exchange occurred:

> "THE COURT: I know what you're trying to bring out, [defense counsel], but, remember, I had a son who went through this too, so I'm—
>
> [DEFENSE COUNSEL]: And I—
>
> THE COURT: —I'm well aware of what happens in basic training."

¶ 18    Struve testified that, if his drill sergeant told him to do something, he would do it without question. During the first three weeks, the drill sergeants yelled at the individuals going through basic training and tried to intimidate them. The training got better toward the end.

¶ 19    Defendant testified that he consumed "quite a few" alcoholic beverages at Struve's party and became intoxicated. Defendant sat down on a couch and talked to K.R. for approximately 30 minutes. K.R. sat on defendant's lap, and they continued to talk for approximately 10 minutes. K.R. was not slurring her speech, and she did not seem impaired. Defendant asked K.R. if she wanted to "go somewhere," and she said yes. Defendant asked Struve if there was still a bedroom in the basement, and Struve said yes. Defendant told K.R. about the room. K.R. took defendant by the hand, and they walked downstairs. They lay on a mattress in the basement and "made out for a little while." K.R. was actively participating. Defendant asked K.R. if she would perform oral sex on him, and she said no. Defendant then asked K.R. if she wanted to have sexual intercourse, and she said yes. K.R. removed her shirt, and defendant helped her remove her shorts. Defendant removed his pants and began having sexual intercourse with K.R. Defense counsel asked defendant if K.R. said anything during sexual intercourse, and defendant said that "there were yeses and moans."

¶ 20    Defendant noticed that there was a light illuminating the room. It looked like a cell phone. Defendant felt a hand on his back and heard Nache whisper " 'Welcome to the Unit.' " Warden

was holding a cell phone. Defendant saw Warden try to put his penis in K.R.'s mouth. K.R. pushed it away. Nache told defendant that K.R. "had a tampon in." Defendant stopped having sexual intercourse with K.R., and Nache removed the tampon. At this point, defendant "felt like something was wrong." Defendant said that he thought that they were all going to have sexual intercourse and he felt uncomfortable with that. Defendant stopped and went upstairs. Defendant testified that he had noticed that it had been difficult to insert his penis into K.R.'s vagina before Nache told him about the tampon.

¶ 21　　Defendant went upstairs and began talking to one of his friends. About 10 or 15 minutes later, Morse came upstairs and yelled at Nache. Morse said that Nache raped K.R. Nache said that he had nothing to do with it. Kight and Morse asked defendant what happened, and he said that he had sexual intercourse with K.R. They asked defendant if he raped K.R., and he said no.

¶ 22　　Defendant left for basic training in Fort Sill, Oklahoma, a few days after the party. Defendant testified that basic training was mentally and physically stressful. Four-and-a-half weeks into basic training, a drill sergeant drove defendant to Kapinus's office. The drill sergeant did not tell defendant where he was going or why, and the drill sergeant did not give defendant the option not to go. When they arrived, the drill sergeant told defendant that he was in Kapinus's custody, and the drill sergeant left. Defendant heard the drill sergeant call Kapinus "sir," which caused defendant to believe that Kapinus was an officer. Kapinus never told defendant his rank.

¶ 23　　It was approximately 3 p.m. when defendant arrived at Kapinus's office. Kapinus took defendant into an interrogation room. Kapinus asked defendant about his military career and what he wanted in life. After about an hour, Kapinus told defendant a story about somebody he had been friends with when he was younger who was in a similar situation to defendant. At that point, defendant understood why he was there. After approximately an hour or an hour and a half, Kapinus told defendant he was being charged with criminal sexual assault and sodomy. Kapinus did not tell defendant whether these were state charges or military charges.

¶ 24　　Kapinus asked defendant questions about what had occurred at the party. Defendant responded either "yes" or "no" to Kapinus's questions "depending on *** the vibe in the room." Defendant explained: "Well, it almost seemed like any time I would say something he would almost stop me and on a couple of occasions he told me if I was to lie to him that I could go to a military prison for five years." When Kapinus would "stop" defendant, he would put up his hand with five fingers extended. The following exchange occurred between defense counsel and defendant:

> "Q: Did you ever give [Kapinus] an answer and then have him react to it like that was not the answer he was looking for?
>
> A: Yes, sir.
>
> Q: How often did that happen?
>
> A: Very often.
>
> Q: What would happen if you said something and then it appeared that he didn't, that was not the answer he wanted you to give?
>
> A: He would put up his hand. He had made comments on a couple of occasions about going to military prison. He had told me that if I just went along with, or cooperated I suppose, that the Army could take care of it. That he could talk to my

- 6 -

commanding officer and that I wouldn't have a problem. That I could finish my basic training."

¶ 25 Defendant testified that Kapinus asked him if K.R. said no, and defendant said she did not. Kapinus then put up his hand. Defendant said that K.R. might have said no. Kapinus asked how many times K.R. said no, and defendant said once. Kapinus shook his head, and defendant said three.

¶ 26 Eventually, Kapinus asked defendant to type a written statement. Defendant stopped a lot while he was writing the statement because he knew that what he was writing did not actually happen. Defendant testified that he wrote things in his statement that did not happen because it was what he thought he was supposed to write. Defendant believed that if he said what Kapinus wanted him to say, he would be able to finish his basic training. Defendant believed that if he did not say what Kapinus wanted him to say, he would go to military prison for five years. Defendant testified that he did not sign a form regarding his *Miranda* rights at the beginning of the interview. Rather, he signed the form right before he started to type his statement. Kapinus did not read the form to him at any point. Defendant said the time was not written on the *Miranda* form when he signed it. Defendant stated that his testimony at trial was true and his written statement was not. Defendant felt intimidated by Kapinus.

¶ 27 After hearing arguments, the court found defendant guilty of criminal sexual assault. During its pronunciation of guilt, the court stated: "First of all, I have a son who is about a year ahead of you in the Army. Trustworthiness and the truth, those are the two things they drill into you in boot camp. I don't find much of it from you." The court indicated that it found defendant's testimony that Kapinus did not read him his *Miranda* rights and did not provide the forms at the times indicated on the forms was not credible. The court noted that it appeared that defendant had written his initials next to the date and time on both *Miranda* forms. The court stated:

"You're having me believe that an officer of the United States military, who has little knowledge of the case, he's sent this stuff to him from Moline, Illinois. He gets a brief background about a case, and *** he's supposed to interview you about your knowledge of the case. So the first thing he does is he sets you up by not explaining everything on this sheet. My understanding is you read and write English pretty well because otherwise they never would have accepted you in the Army because that is one of the requirements."

The court stated that defendant's testimony indicating that the *Miranda* forms had been "back-timed" was "an insult to the Army."

¶ 28 The court stated that it believed that defendant's statement to Kapinus was truthful, believable, reliable, and not coerced. The court noted that the statement defendant gave to Kapinus occurred much closer in time to the incident than his testimony in court. The court noted that defendant's trial testimony mirrored Struve's testimony. The court found that Struve had reasons not to tell the truth because he was the host of the party and defendant's best friend.

¶ 29 The court noted that K.R. said that she had sexual intercourse before and after her tampon was removed. The court stated:

"I can't envision any woman wanting to have sex with a tampon in. Period. It just doesn't happen. It doesn't make sense. And the only reason a woman would have sex

with a tampon [in] is because she's unconscious or unable to understand the totality of what is going on ***."

The court reasoned that the fact that K.R. was wearing a tampon while defendant had sexual intercourse with her was "the biggest indication of all that she had no ability to consent to anything because only a woman who basically can't consent because she's had way too much to drink or is otherwise incapacitated would ever have sex with a tampon [in]."

¶ 30      The court sentenced defendant to four years' imprisonment.

¶ 31                                II. ANALYSIS

¶ 32      Defendant argues that the trial judge erred in assessing defendant's credibility against Kapinus's credibility based on his son's Army experiences. Defendant contends that the judge showed that he was evaluating the evidence through the lens of his son's Army experience during the trial when, in response to the State objecting to defense counsel questioning Struve about basic training, the judge said that he was "well aware of what happens in basic training" because he "had a son that went through this too." Defendant also argues that the following comments made during the court's pronouncement of guilt showed that the court did not evaluate the credibility of defendant and Kapinus "entirely on their own merits":

"First of all, I have a son who is about a year ahead of you [(defendant)] in the Army. Trustworthiness and the truth, those are the two things they drill into you in boot camp. I don't find much of it from you.

You're having me believe that an officer of the United States military, who has little knowledge of the case, he's sent this stuff to him from Moline, Illinois. He gets a brief background about a case and *** he's supposed to interview you about your knowledge of the case. So the first thing he does is he sets you up by not explaining everything on this sheet. My understanding is you read and write English pretty well because otherwise they never would have accepted you in the Army because that is one of the requirements.

You also have me try to believe that he never put a time on the documents. There's two separate ones: 16:28 and 19:48. Those look like your initials right on top of them. The dates, times, and then your initials right on top of both of them. Both the documents say you don't have to talk to anybody, you don't have to say anything, but anything you say can and will be used against you.

So you start there by having me believe that basically that these documents aren't what they purport to be because these were back-dated, back-timed, whatever, and that basically you never signed anything until after you wrote these statements. Well, quite frankly, that's an insult to the Army."

¶ 33      Defendant also claims that the judge improperly considered his son's experiences when he remarked: "I've got three kids about your age, and I understand what goes on and everything that happens."

¶ 34      Defendant acknowledges that he failed to preserve this issue, but he argues that the issue is reviewable under the plain-error doctrine.

"[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of

the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 35    "The first step of plain-error review is determining whether any error occurred." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). "Deliberations of the court must necessarily be limited to the record before it." *People v. Steidl*, 177 Ill. 2d 239, 266 (1997). " 'A determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due process of law.' " *People v. Dameron*, 196 Ill. 2d 156, 171-72 (2001) (quoting *People v. Wallenberg*, 24 Ill. 2d 350, 354 (1962)). We find no error. The trial judge conducted no private investigation. The realities of military boot camp are widely known to many judges and jurors. Many, if not most, adults know about boot camp, if not from military service, then from reports from those who have served. See Illinois Pattern Jury Instructions, Criminal, Nos. 1.01(10), 1.01A(2) (approved July 18, 2014). Without error, there can be no plain error. However, any error resulting from the judge's comments concerning his son's Army experiences did not rise to the level of plain error under either prong of the plain-error doctrine.

¶ 36                          A. First Prong of the Plain-Error Doctrine

¶ 37    Defendant argues that the evidence was closely balanced such that reversal is warranted under the first prong of the plain-error doctrine because the trial evidence amounted to a credibility contest. An examination of the trial evidence in this case shows that the evidence was not closely balanced.

¶ 38    Under the first prong of the plain-error doctrine, forfeiture is excused where "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." *Piatkowski*, 225 Ill. 2d at 565. "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53.

¶ 39    In the instant case, the evidence was not closely balanced. Kapinus testified that defendant provided a sworn statement during their interview. In the statement, defendant said that K.R. told him that she needed a quiet place to lie down at the party. Defendant and K.R. were both intoxicated. K.R.'s "eyes were low, she had a hard time standing up, and she slurred her speech." Defendant took K.R. to the basement, and she used defendant to hold herself up as they walked downstairs. Defendant and K.R. lay on a mattress, and defendant fell asleep. He awoke a few minutes later and started kissing K.R. Nache and Warden entered the room. Defendant put his hand down K.R.'s shorts. K.R. said to stop three times, but he did not. Defendant removed K.R.'s shorts, and someone else removed her shirt and underwear. Defendant began having sexual intercourse with K.R. Defendant said that K.R. was asleep at that time. Someone told defendant to stop and removed K.R.'s tampon. Defendant then resumed having sexual intercourse with K.R. Defendant observed one of the other men place his penis in K.R.'s mouth. K.R.'s eyes were closed at that time. Eventually, defendant "finally realized what [he] was actually doing" and stopped.

¶ 40    Defendant's statement to Kapinus was partially corroborated by K.R.'s testimony. K.R. testified she woke up on a mattress in a dark room with a man on top of her having sexual intercourse with her. She heard another man say to pull her tampon out, and someone did. The man on top of her continued to have sexual intercourse with her. Another man tried to place his penis in her mouth, and she pushed it away. She said that she was "out of it" and did not know what to do.

¶ 41    Defendant claimed during his trial testimony that his statement to Kapinus was untrue. Defendant testified that he believed, if he said what Kapinus wanted to hear, he would be able to finish basic training. Defendant believed that if he did not say what Kapinus wanted to hear, he would go to military prison for five years because Kapinus said he could go to military prison if he lied. However, this testimony was simply self-serving and implausible.

¶ 42    Defendant also claimed during his trial testimony that the sexual intercourse he engaged in with K.R. was consensual. Much like the testimony regarding his statement to Kapinus, this testimony was also self-serving and implausible. Notably, defendant testified that K.R. was wearing a tampon while he was having sexual intercourse with her. It is implausible that K.R. would be actively participating in sexual intercourse with defendant while wearing a tampon. Defendant apparently did not notice the tampon until another man mentioned it. This testimony alone gave the trial judge more than adequate basis to disbelieve anything defendant said: *falsus in uno, falsus in omnibus*. The trial judge's statements regarding the Army, when viewed in conjunction with this testimony, are much more understandable. In fact, the trial judge made it clear that it was defendant's testimony regarding the tampon that cast the most doubt on defendant's credibility. See *supra* ¶ 29.

¶ 43    In its decisions in *Sebby*, 2017 IL 119445, ¶¶ 61-63, and *People v. Naylor*, 229 Ill. 2d 584, 608 (2008), our supreme court found the evidence to be closely balanced when the evidence amounted to a credibility contest between State witnesses and defense witnesses who testified as to different versions of events where both accounts were credible. However, neither *Sebby* nor *Naylor* involved a "credibility contest" in which a defendant claimed that a prior confession was untrue. Also, "courts have found no 'credibility contest' when one party's version of the events was either implausible or corroborated by other evidence." *People v. Olla*, 2018 IL App (2d) 160118, ¶ 35. The evidence was not closely balanced.

¶ 44                              B. Second Prong of the Plain-Error Doctrine

¶ 45    Defendant argues that he is entitled to relief under the second prong of the plain-error doctrine because the judge's assessment of the credibility of the witnesses in light of his son's Army experiences constituted structural error. Again, we find no error. However, even assuming error resulting from the trial judge's consideration of his son's Army experiences, it did not rise to the level of structural error.

¶ 46    Under the second prong of the plain-error doctrine, forfeiture is excused where "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565. Our supreme court equates the second prong of plain error with structural error. *Thompson*, 238 Ill. 2d at 613. A structural error is " 'a systemic error which serves to "erode the integrity of the judicial process and undermine the fairness of the defendant's trial." ' " *Id.* at 614 (quoting *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009), quoting *People v. Herron*, 215 Ill. 2d 167, 186 (2005)).

¶ 47       For all the reasons stated above, even if the trial judge's comments were error, they did not rise to the level of structural error.

¶ 48                                    CONCLUSION

¶ 49       We find no error. We also conclude that if any error occurred, it did not constitute plain error.

¶ 50       For the foregoing reasons, we affirm the judgment of the circuit court of Rock Island County.

¶ 51       Affirmed.

¶ 52       JUSTICE McDADE, dissenting:

¶ 53       I would reverse the defendant's conviction in this case on the basis that the trial court relied on matters outside of the record in assessing the defendant's credibility and, ultimately, his guilt. I believe that this position is amply supported by the record.

¶ 54       First, in response to the State's objection to defense counsel questioning a witness regarding whether he was afraid of his drill sergeant in boot camp, the court stated: "I know what you're trying to bring out, [defense counsel], but, remember, I had a son who went through this too, so I'm *** well aware of what happens in basic training."

¶ 55       Then, during its pronunciation of guilt, the court stated:

          "[T]here's some issues I have with you, [defendant].

              First of all, I have a son who is about a year ahead of you [(defendant)] in the Army. Trustworthiness and truth, those are the two things they drill into you in boot camp. I don't find much of it from you.

              You're having me believe that an officer of the United States military, who has little knowledge of the case, he's sent this stuff to him from Moline, Illinois. He gets a brief background about a case, and just he's supposed to interview you about your knowledge of the case. So the first thing he does is he sets you up by not explaining everything on this sheet. My understanding is you read and write English pretty well because otherwise they never would have accepted you in the Army because that is one of the requirements.

              You also have me try to believe he never put a time on the documents. There's two separate ones: 16:28 and 19:48. Those look like your initials right on top of them. The dates, times, and then your initials right on top of both of them. Both the documents say you don't have to talk to anybody, you don't have to say anything, but anything you say can and will be used against you.

              So you start there by having me believe that basically that these documents aren't what they purport to be because these were back-dated, back-timed, whatever, and that basically you never signed anything until after you wrote these statements. Well, quite frankly, that's an insult to the Army."

¶ 56       I believe that the above statements of the trial court show that the judge assessed the credibility of the witnesses—namely, the defendant and the Army officer who interviewed him—in light of the judge's preconceived notions about the Army based on the judge's son's experiences. It was reversible error for the judge to consider matters outside the record.

- 11 -

*Wallenberg*, 24 Ill. 2d at 354 ("A determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due process of law."); *Dameron*, 196 Ill. 2d at 178 ("A judge need not give controlling weight to the improper evidence to trigger our reversal; even giving 'very little weight' is improper." (quoting *People v. Simms*, 121 Ill. 2d 259, 274 (1988))); *Steidl*, 177 Ill. 2d at 266 (holding that the judge's consideration of information outside the record was prejudicial error).

¶ 57    Additionally, I believe the judge assessed the credibility of defendant and Kapinus based on an artificial standard—namely, how he would expect a reasonable Army officer to behave. It appeared that the judge expected Army personnel to have and act in accord with certain positive traits, like truthfulness and trustworthiness, and he used that expectation to judge testimonial credibility. He rejected any suggestion that Kapinus, as "an officer of the United States military" could conceivably have done what defendant suggested was done, and he discounted defendant's claims as "an insult to the Army," ultimately concluding that defendant did not live up to these Army standards.